LILLIE MAE TORWEGGE v. GERALD B. O'REIL-
LY, Trustee Under the Will of Mary Jane Torwegge;
LAURA SIMCOKE, CHARLES M. SIMCOKE,
MABEL GRANT, ROBERT GRANT and THOMAS
P. KENNY, Appellants.

.Division One, March 14, 1922.

1. **ADOPTION OF CHILDREN: Statutory Provisions: Prior to 1899:
Custody.** Under the statutes of this State prior to the amendment
of 1899, any child could be adopted, so far as necessary to confer
upon it the right to inherit from the adoptive parent, without the
consent of the child's natural parent or of any court or other au-
thority. But the adoptive parent was not entitled, as against the
natural parent, to the custody of the child by the mere act of
adoption and could become so only by the legal consent of one
entitled to dispose of the child's custody.

2. ———: ———: **Amendment of 1899: Application.** The amendment
of the statutes regulating the adoption of children enacted in 1899
(Sec. 5250, R. S. 1899) applied only to the children therein defi-
nitely described, namely: Such as (1) had been intrusted by their
parents or parent to .(a) some incorporated institution for the care
of minor children, or (b) to some individual who conducted such
an institution; or (2) had been received by such institution in
some other way for care and custody; and then (3) had been
abandoned by their parents for two years; and also (4) were less
than seven years old. And such reception for care and custody,
abandonment for two years by the parents and an age of less than
seven years are conditions precedent to the exercise by the in-
stitution of the powers which said section confers.

3. ———: ———: ———: ———. The amendment of 1899 (Sec.
5250, R. S. 1899) did not exclude from the operation of the general
statutes of adoption (Secs. 5246-5249, R. S. 1899) children who
had been intrusted to institutions for the care and custody of
minor children, but who did not come within the scope of that
amendment.

4. ———: ———: **Deed of Adoption: Recitals: Statutes Applicable:
Knowledge of Law.** Parties are chargeable with knowledge of the
law. And where it appeared from the recitals of a deed of
adoption, executed by an incorporated institution for the care

Torwegge v. O'Reilly.

and custody of minor children in whose custody the adopted child was, and by a husband and wife as adoptive parents, that the child did not come within the provisions of Section 5250, Revised Statutes 1899, such adoptive parents were charged with the knowledge that the only rights they acquired as to the custody of such child were such as they could obtain under the law exclusive of said section.

5. ———: ———: ———: ———: **Consideration.** Where a deed of adoption of a child, executed by an incorporated institution in whose custody the child was, and by a husband and wife as adoptive parents, contained a recital that "by a lawful instrument in writing" there was conferred upon the institution the right to secure for said child a home in a good family "including legal adoption," and after the execution of such deed the adoptive parents retained the custody of such child during the remainder of their lives, the court was justified in finding that such writing existed and conferred the power stated, and the adoptive parents having received under such deed what they contracted for it was not void for want of consideration.

6. ———: **Will Executed Before Adoption: Pretermitted Heir.** Where a husband and wife executed a deed of adoption of a child, the husband having theretofore made his last will and testament leaving his entire estate (after paying debts, funeral expenses and a legacy) to his wife, and not mentioning such child, and after such adoption having died leaving such will unrevoked and leaving his widow and such child as his only heirs, the interest of such child in his estate was the same as if he had died intestate.

7. **EQUITY: Confidential Relations: Fraud: Setting Aside Conveyances.** A court of equity will set aside conveyances of her property, made by plaintiff, a young woman, eighteen years of age, without business experience and with little education, who acted without full knowledge of the facts and of the value of such property and of her rights and without independent legal advice, and who was induced to make such conveyances by one standing in a confidential relation to her, and thereby conveyed valuable property, without adequate consideration, to persons having no claim thereto and having full knowledge of the facts, and where such conveyances were made in pursuance of a purported settlement of alleged conflicting claims to an estate which were without any legal basis.

Appeal from St. Louis City Circuit Court.—*Hon. Wilson A. Taylor*, Judge.

AFFIRMED.

*Charles W. Bates* and *David Baron* for appellants.

(1)  The burden is upon plaintiff to establish her right to Francis W. Torwegge's property by showing that she was his legally adopted daughter or that he had made a contract to adopt her, the consideration of which she had performed. Grantham v. Gossett, 182 Mo. 651; Ashbury v. Hicklin, 181 Mo. 673; Wales v. Holden, 209 Mo. 552.  (a) Inheritance flows naturally with the blood. Hockaday v. Lynn, 200 Mo. 466.  And if its course is to be diverted, such result is only accomplished by rigid compliance with the law.  Forrister v. Sullivan, 231 Mo. 373 to 376.  (b) The widow is no less protected than the blood.  The child had not been in the institution two years.  Neither parent consented.  Sec. 5250, R. S. 1899; Sec. 1675, R. S. 1909; In re Penny, 194 Mo. App. 698; Orey v. Moller, 142 Mo. App. 579; In Matter of Clements, 78 Mo. 355; Shearer v. Weaver, 56 Kan. 578; Ex parte Clark, 87 Cal. 638; Malaney v. Cameron, 98 Kan. 620; Ferguson v. Jones, 17 Ore. 204.  It was not the intention of Mr. Torwegge, as evidenced by the deed of January 13, 1900, merely to adopt the plaintiff as his heir under Secs. 5246, 5247, 5248, .R. S. 1899, and leave the right to her control and custody in the natural parents.  Courts cannot make a new contract for him.  Those sections do not apply to the deed in question.  Fugate v. Allen, 119 Mo. App. 190; Gilkerson v. Railroad, 222 Mo. 204; McGrew v. Railroad, 230 Mo. 524; Ruschenberg v. Railroad, 161 Mo. 70, 84; State ex rel. v. Lindell Hotel Co., 9 Mo. App. 453; 2 Lewis' Suth. Stat. Const. (2 Ed.) sec. 491, p. 919.  A person may be taken into the family and treated as a member of the family, taking the family name, thereby creating a family relationship, and yet not have been adopted, and therefore not entitled to the rights of a child.  Fugate v. Allen, 119 Mo. App. 190; Nelson v. Poormans, 215 S. W. 753; Fitzpatrick v. Dooley, 112 Mo. App. 172.  A court of equity will not furnish

relief in case of a defective execution of a statutory power. In the case at bar the Society and Francis W. Torwegge defectively exercised the statutory power by omitting compliance with the elements required by the statute. R. S. 1899, sec. 5250; Allen v. Hornett, 116 Mo. 286; Stevens v. De La Vaulz, 166 Mo. 27. Since this instrument was inoperative, it cannot be construed as a contract to adopt plaintiff, and there can be no parol adoption without a contract. Grantham v. Gossett, 182 Mo. 658, 670; Wales v. Holden, 209 Mo. 558; Norwack v. Berger, 133 Mo. 35; Malaney v. Cameron, 98 Kan. 622. (3) Even though Mary Jane Torwegge has adopted plaintiff, that fact does not make plaintiff the adopted daughter of Francis W. Torwegge. Hockaday v. Lynn, 200 Mo. 456; Orey v. Moller, 142 Mo. App. 579. (4) As to Francis W. Torwegge, should the deed of January 13, 1900, be taken most favorably for plaintiff, it is and can be no more than an offer on his part to adopt plaintiff and was wholly without consideration up to the time of his death in September, 1901, when plaintiff was but three and one-half years old and twenty months after the date of the deed. Fugate v. Allen, 119 Mo. App. 190; Teats v. Flanders, 118 Mo. 660; Beach v. Bryan, 155 Mo. App. 33; Jaffre v. Jacobson, 48 Fed. 21. Plaintiffs' claim must be supported by evidence that can be relied upon with the utmost confidence, proving the existence of the contract, its terms and conditions and a substantial and meritorious compliance therewith, with such certainty and definiteness as to leave no room for reasonable doubt. Kinney v. Murray, 170 Mo. 700; Signaigo v. Signaigo, 205 S. W. 30. (5) Settlement of bona-fide disputes is a valid and sufficient consideration to support a contract of settlement, and particularly of family differences, and is favored by the courts. Such settlement was had in this case and should be sustained. Faust's Admx. v. Birner, 30 Mo. 414; Bunel v. O'Day, 125 Fed. 303; Owen v. Hancock, 38 Tenn. (1 Head.) 563; Wood v. Tel. Co., 223 Mo. 565; Troll v. Spencer, 238 Mo. 81; Mateer v. Ry. Co., 105 Mo. 351; Reilly v. Chouquette, 18 Mo. 226.

Even though the court should hold that plaintiff was either legally adopted by Francis W. Torwegge or is entitled to rights to his property as if legally adopted, still there was a bona-fide difference between her and the defendants, Mabel Grant and Laura Simcoke, as to plaintiff's status and rights, based upon reasonable grounds. (6) Plaintiff accepted from defendants Mabel Grant and Laura Simcoke the benefits accruing to her under the settlement up to the time of bringing this suit, still retains them, does not offer to return them, and cannot repudiate the settlement nor maintain this suit. Whalen v. Reilly, 61 Mo. 565; Paquin v. Milliken, 163 Mo. 104; Dalpine v. Lume, 145 Mo. App. 556. (7) When without fraud practiced upon him, a person signs a contract, he is conclusively presumed to know its contents and to accept the terms thereof, and the fact that he did not read it does not alter the rule. Donnelly v. Trust Co., 239 Mo. 388; Johnston v. Life Ins. Co., 93 Mo. App. 580; Leicher v. Kenney, 98 Mo. App. 394. (8) There was no fraud perpetrated on plaintiff. Bishop on Con. (2 Ed.) sec. 683; Evans v. Foreman, 60 Mo. 449; Workman v. Campbell, 57 Mo. 53; Lammers v. Sewing Mach. Co., 23 Mo. App. 471. (9) Any act by which, with knowledge of the alleged fraud, a person treats the contract as subsisting, will be an affirmance precluding rescission. Bishop on Contracts (2 Ed.) sec. 683; Evans v. Foreman, 60 Mo. 449; Workman v. Campbell, 57 Mo. 53; Lammers v. Sewing Mach. Co., 23 Mo. App. 471.

*Edward W. Foristel* and *Frank T. Hiemenz* for respondent.

(1) The deed of adoption is valid. It created the relation of parent and child between the Torwegges and the plaintiff. One may adopt a child without the consent of its natural parents or any other person. Reinders v. Koppelmann, 68 Mo. 499; In re Clemens, 78 Mo. 332; Clarkson v. Hatton, 143 Mo. 47; Hawarth v. Hawarth, 123 Mo. App. 303. (2) The plaintiff is a pretermitted

heir, and as such inherited all of the real estate of which her foster father, Francis W. Torwegge, died seized, subject to his widow's dower, or to her right to take a child's share in lieu of dower. Not having elected to take a child's share in lieu of dower, she became a doweress as at common law, and became seized of an undivided third interest in his estate for life, and this interest terminated with her death. Bradley v. Bradley, 24 Mo. 311; Burch v. Brown, 46 Mo. 441; Hill v. Martin, 28 Mo. 81; Hargardine v. Pulte, 27 Mo. 423. (3) In all transactions between persons occupying relations, whether legal, natural, or conventional in their origin, in which confidence is inspired or exists, and trust is reposed by one in another, the burden of proof is thrown upon the person in whom the confidence and trust is reposed, and who has acquired an advantage, to show affirmatively not only that no deception was practiced therein, no undue influence used, but that all was fair, open, and voluntary, and that the transaction was well understood. Digman v. Romine, 141 Mo. 475; 2 Pom. Eq. sec. 947; Allore v. Jewell, 94 U. S. 506; Griffith v. Godey, 113 U. S. 89; Miller v. Simonds, 72 Mo. 669; Garvin v. Williams, 44 Mo. 465; Street v. Gass, 62 Mo. 229; Rankin v. Patton, 65 Mo. 416; Ford v. Hennessey, 70 Mo. 580; Ilgenfritz v. Ilgenfritz, 116 Mo. 429; Caspari v. Church, 12 Mo. App. 293; Cadwallader v. West, 48 Mo. 483; Bradshaw v. Yates, 67 Mo. 221; Garvin v. Williams, 50 Mo. 206; Harvey v. Sullens, 46 Mo. 147; Yosti v. Laughren, 49 Mo. 594; 1 Story's Eq. Jurs. secs. 312-14; Gay v. Gillilan, 92 Mo. 263-4; Martin v. Baker, 135 Mo. 503; Ennis v. Burhan, 159 Mo. 518; Kirchner v. Kirchner, 113 Mo. 296; Ryan v. Ryan, 174 Mo. 279; Obst v. Unnerstall, 184 Mo. 392; Alkord v. Skinner, L. R. Ch. Div. 145; Wright v. Carter, 1 Ch. 27; Bury v. Oppenheim, 26 Bea. 594; Savery v. King, 5 H. L. Cas. 627; Sharp v. Leach, 8 Jur. (N. S.) 1026; Thomas v. Whitney, 186 Ill. 225; Davis v. Strang, 86 Va. 793; Yordi v. Yordi, 91 Pac. 348. (4) Voluntary conveyances or conveyances for a grossly inadequate

Torwegge v. O'Reilly.

consideration to one standing in the relation of trust and confidence will be avoided in equity in all cases where they are of such a nature that a judicious friend, regarding the interests of the grantor, would not have advised them. McDonnell v. Build. Assn., 175 Mo. 274; Turner v. Turner, 44 Mo. 537; Cadwallader v. West, 48 Mo. 494-5; Albert v. Haeberly, 68 N. J. Eq., 664; Haydoch v. Haydoch, 34 N. J. Eq. 575; Prideaux v. Lonsdale, 1 D. C. & J. (N. S.) 433; Powell v. Powell, 1 Ch. 243; Bambregge v. Browns, L. R. 18 Ch. Div. 188; Hatch v. Hatch, 9 Ves. Jr. 292; Gillespie v. Holland, 48 Ark. 28. (5) A grossly inadequate consideration is of itself a badge of fraud in transactions between persons standing in confidential relations of any character, and of whatever origin. Dickson v. Kempinsky, 96 Mo. 252; McDonough v. Build. Assn., 175 Mo. 274; Turner v. Turner, 44 Mo. 537. (6) Withholding facts or information by a party whose duty requires him to speak is as much a fraud as an express fraudulent misrepresentation. 1 Black on Can. & Resc. secs. 58, 59. (7) Adopted children inherit as natural children; their rights are no greater or less; it is not necessary to inherit that one be specifically adopted as an heir at law. Fosburg v. Rodgers, 114 Mo. 132; Thomas v. Maloney, 142 Mo. App. 198. (8) In transactions between persons standing in confidential relations, a court of equity will presume confidence placed and influence exerted. Gay v. Gillilan, 92 Mo. 263; Digman v. Romine, 141 Mo. 475. (9) Fraud need not be proved by direct evidence. It can rarely be so proved. It is most frequently to be deducted from the circumstances surrounding the transactions and the acts of the parties. Bank v. Worthington, 145 Mo. 100. (10) Whenever fraud is the matter in issue, any unusual clause in an instrument, any unusual method of transacting the business, apparently done with a view for effect and to give to the transaction an air of honesty, is of itself a badge of fraud. Baldwin v. Whitcomb, 71 Mo. 659; Hunts v. Shepherd, 79 Mo. 147; Hage v. Hubb, 94 Mo. 503; State v. O'Neill, 151 Mo. 85; Robertson v.

Stone, 165 Mo. 360. (11) A person is said to stand in a fiduciary relation to another, when he has rights and powers which he is bound to exercise for the benefit of that other person. Ryan v. Ryan, 174 Mo. 286; 1 Black on Can. & Resc. sec. 42. (12) Misrepresenting the law or legal effect of an instrument especially to one in a confidential relation, is ground for relief in equity. Armstrong v. Armstrong, 115 Mo. 465; Wells v. Adams, 88 Mo. App. 227; Hickam v. Hickam, 46 Mo. App. 506. (13) Undue influence, fraud, deceit or deception of a third person through whom another knowingly benefits, is regarded in the law as an act of the beneficiary, the property acquired is tainted with the fraud or deception; equity will treat it as the beneficiary's fraud or deception, and set aside the conveyance on timely application. Miller v. Simonds, 72 Mo. 687; Rankin v. Patton, 65 Mo. 378; Ford v. Hennessey, 70 Mo. 580. (14) Plaintiff stands as to defendants in a relation of trust and confidence. (15) A deed or act of adoption as to the adoption itself is liberally and reasonably construed in favor of the adoption. Sewell v. Roberts, 115 Mass. 265; Hockaday v. Lynn, 200 Mo. 456; Fosburgh v. Rodgers, 114 Mo. 122; Estate of McKeag, 141 Cal. 408; In re John son, 98 Cal. 538. (16) Francis W. and Mary J. Torwegge, as husband and wife, solemnly subscribed, acknowledged and recorded the deed of adoption, defendants' strangers to this deed of adoption, but in privity of estate with Francis W. Torwegge and Mary Jane Torwegge, and now claiming by, through and under them, and who acquired their interest long after they had subscribed and recorded the deed of adoption, are estopped from offering in evidence, or setting up in defense, any irregularity or defect in the deed of adoption. Appeal of Wolff, 13 Atl. 764; Abney v. DeLoach, 84 Ala 398; Nugent v. Powell, 4 Wyo. 201; In re Williams, 102 Cal. 81; In re Johnson, 98 Cal., 538; Estate of Camp, 131 Cal. 471; Brown's Adoption, 25 Pa. Sup. Ct. 265; Estate of McKeag, 141 Cal. 410. (17) The Act of 1899, now Sec. 1675, R. S. 1909, was intended to fill a gap in

the law of adoption, existing by reason of the Legislature having failed to provide a method whereby an abandoned child might be adopted, and the right of the custody of the natural parents terminated; it provided a definite period of abandonment and the approval of the probate court as to fitness of the foster parents; it made no change in the law of adoption except to provide a method of forever terminating the right of custody of the natural parents; in every other respect, adoptions were made as theretofore.

JAMES T. BLAIR, J.—This is an appeal from a judgment of the St. Louis City Circuit Court which establishes the claim of respondent that she was legally adopted by Francis W. and Mary J. Torwegge and entitled, as pretermitted heir of Francis W. and as devisee of Mary J., to certain property in the city and county of St. Louis. In 1899 the Torwegges lived in St. Louis County. They were childless. At that time there existed in the city of St. Louis an incorporated society known as the Benevolent Association of the Christian Church. The purpose of this association seems to have been to receive and care for homeless and abandoned children. In June, 1899, respondent, then a little more than one year old, was intrusted to this association. The Torwegges desired to take her into their home. She was put in their care about July, 1899. They kept her until January, 1900, when they evidently concluded to make a more definite arrangement respecting her, and this was attempted to be accomplished by the execution of a deed in the form following:

"Whereas as a female child, Beulah Baurn was born in the State of Missouri, County of St. Louis, on or about the 9th day of February, A. D. 1898, and, whereas, Mrs. Roger Hayne, of St. Louis, County of St. Louis, State of Missouri, for good and sufficient reasons did, by a lawful instrument of writing, entered into on the 26th day of June A. D. 1899, surrender and deliver said child to the Benevolent Association of the Christian

Church, a benevolent association legally chartered according to the Constitution and laws of the State of Missouri; thereby conferring upon said society the right to secure for said child a home in a good family on the most favorable terms possible, including legal adoption, indenture and such other conditions as circumstances may make possible or necessary; and, whereas, said child has been placed by said association in the home of F. W. Torwegge and Mary J. Torwegge, husband and wife, residing in County of St. Louis and State of Missouri, who have had the said child for six months, and have become much attached to said child, and desire to adopt her as their own child and to give said child such treatment and Christian education as they would if said child had been born to them in lawful wedlock, and change her name to Lily May; and, whereas, the said F. W. Torwegge and Mary J. Torwegge, husband and wife, are able to properly bring up said child and to furnish her with suitable nurture and Christian education:

"Now, therefore, this instrument witnesseth that by and with the consent of the Benevolent Association of the Christian Church the said F. W. Torwegge and Mary Torwegge, husband and wife, do hereby adopt said child as their own, thereby conferring upon her all the rights, privileges and responsibilities which would pertain to her if she had been born to them in lawful wedlock, and change her name to Lily May.

"In witness whereof, said society has caused this instrument to be signed by the president of the Christian Church, secretary, and its corporate seal affixed, and the said Benevolent Association has hereunto set its hand and seal this 13th day of January, A. D. 1900."

This instrument was signed and acknowledged by the association by its proper officers and also signed and acknowledged by the Torwegges. It was duly filed for record and recorded in St. Louis County, the county in which the Torwegges resided. Respondent remained in the home and custody of the Torwegges until after the attainment of her majority, in February, 1916. Francis

W. Torwegge died about September 1, 1901, possessed
of certain real property. His will, subsequently pro-
bated, was dated October 11, 1897, and, of course, made
no mention of respondent. Appellant O'Reilly was one
of the witnesses to this will. Mary J. Torwegge filed
no election, but used the property as her own. Respond-
ent continued to live with her. In 1903 Mary J. Tor-
wegge attempted to convey one of the tracts of which
Francis W. died seized. In connection with this convey-
ance Mary J. Torwegge, in October, 1911, made an af-
fidavit in which she stated Francis W. Torwegge "left
surviving him no children or descendants of deceased
child or children." Mary J. Torwegge died in April,
1916. September 20, 1915, she executed a will where-
in she provided for several small legacies, which ag-
gregated $605, and then gave two-thirds of the rest of
her estate to her nieces, appellants Mabel Grant and
Laura Simcoke, absolutely. The remaining one-third
she gave to appellant O'Reilly, in trust "for the use and
benefit of the girl known as Lillie Mae Torwegge," who
is the respondent in this case. O'Reilly was empowered
to collect rents on the property put in his care and, after
expenses were paid, to pay over to respondent thirty dol-
lars per month. Any balance of income was directed to
be held in trust for respondent until she became thirty
years of age, at which time whatever was left of the trust
estate was to be delivered to her; but if she died before
attaining the age of thirty, the trust property was to be
delivered to Mrs. Simcoke and Mrs. Grant, share and
share alike. The trustee was empowered to invest and
reinvest trust funds and to sell trust real property and
reinvest the proceeds whenever Mrs. Simcoke and Mrs.
Grant might "order him to do so." Provisions against
anticipation of her income by respondent were included
and for annual accounting and for remunerating the
trustee and paying reasonable expenses out of the trust
fund. Mrs. Torwegge's will did not describe any prop-
erty. O'Reilly was also named as executor under the
will and he and Mrs. Grant were named as guardians of

respondent, but did not qualify as such. No bond was required of O'Reilly in any of his several capacities, nor of Mrs. Grant as guardian. O'Reilly had looked after Mrs. Torwegge's property for her for several years prior to her death, and he drew her will. On April 19, 1916, O'Reilly filed an application for probate of the will of Mary J. Torwegge in which he stated the relationship of Lillie Mae Torwegge to Mary J. Torwegge to be that of "an adopted daughter." Some effort was made to show these words were interlined without authority, but the evidence shows they were in the application when O'Reilly filed it. The will was probated. The inventory showed personal property amounting to $34,502.75. On the application of the Collector, Henry A. Baker was appointed and made an appraisement under the collateral inheritance tax law. On September 20, 1916, he appraised the real property at $56,402.75, estimated the expense of administration and the debts at $4,402.75. Thereupon the probate court assessed the tax at $2,605. Before the appraiser some question concerning the status of respondent was raised, and the executor submitted the matter to his attorney who caused an investigation to be made which brought to light the deed of adoption on record in St. Louis County. On September 20, 1916, the attorney wrote the executor a letter in which he said he had no doubt the deed was a valid deed of adoption; that respondent was entitled to one-half the estate left by Francis W. Torwegge; that the legacy from Mary J. Torwegge was not in lieu of this interest; and that if Mary J. had sold any of Francis W.'s realty the purchaser could recover against her estate. The executor immediately advised Mrs. Grant and Mrs. Simcoke of this discovery. He sent them the letter of his attorney. Respondent was then visiting in Texas. The executor got the letter again from Mrs. Simcoke and Mrs. Grant and says he made a copy of it and delivered it, in his office, to respondent upon her return from Texas, on November 5, 1916. This was the first information respondent was given on the subject. At the time he de-

livered his attorney's letter to Mrs. Simcoke and Mrs. Grant he suggested to them that they would better take the matter up with respondent on her return, and, he says, "clean up the affair one way or the other, as he wouldn't be able to pay out any more rents." This suggestion, whatever it was, was appreciatively referred to in a letter from appellant C. M. Simcoke to the executor under date of October 3, 1916. Simcoke testified the executor had suggested a meeting with Lillie. He said the executor said he couldn't pay respondent or Mrs. Simcoke or Mrs. Grant any more rent money until there was some adjustment, and that respondent and Mrs. Simcoke and Mrs. Grant should get together and agree on something. Simcoke said it was understood by appellants then that respondent was entitled to one-half of Mary J. Torwegge's estate instead of one-third. The executor, also trustee for respondent, corresponded with respondent during the time she was in Texas, but did not mention to her the discovery of the deed of adoption and the change in her apparent status with respect to the property of which Francis W. Torwegge died seized. Mrs. Grant and Mrs. Simcoke also exchanged several letters with respondent, but they did not allude to the deed of adoption.

On October 17, 1916, the executor applied for a reassessment of the inheritance tax. In his application he stated that the deed of adoption had been discovered and that he was advised it was "in legal form and is a valid deed of adoption" and prayed that no tax be assessed against respondent "the adopted daughter and legal heir of F. J. Torwegge and Mary J. Torwegge, his wife." On the same date the first assessment was set aside. On October 18, 1916, the executor filed a second, and verified, application in which he set up the adoption and asserted that respondent was entitled to one-half of the property left by Francis W. Torwegge, and that the estate of Mary J. Torwegge was liable to respondent for rents for ten years on that property. On the same

date an order as prayed was made. The re-assessment was not made until in April or May, 1917.

Before respondent's return from Texas the executor sent her $10 "spending money" in addition to the payments to which she was entitled under the will of Mary J. Torwegge. There is some conflict as to when respondent first saw appellants and O'Reilly after her return to St. Louis. She says Mrs. Grant called her almost as soon as she got home, on the day of her arrival. Mrs. Grant says she did not come that day, but a day later, and that business affairs were not mentioned on this occasion; that the matter of the property was not discussed until the following Saturday. In the meantime respondent had seen O'Reilly and he says he told her "that she was entitled to a far greater share" in the estate of Mrs. Torwegge than appeared in the will and to consult with her friends and, if she desired, to employ counsel to protect her interest; that he "was in a peculiar situation in that" he "was her trustee and couldn't advise her." This was the first information O'Reilly gave respondent of her rights, and he says that at the same time he gave her a copy of the letter of his counsel concerning the deed of adoption and its effect. He says she subsequently called and told him that she had seen Mrs. Grant and Mrs. Simcoke and "had decided to abide by the will of Mrs. Torwegge." Mrs. Grant and Mrs. Simcoke said she showed them the letter referred to, of which O'Reilly had sent them a copy some weeks before, and that she said her mother (Mrs. Torwegge) had given her more than she expected and she was "satisfied with mother's arrangement of the will." This was the Saturday following respondent's return from Texas and was on November 12, 1916. Respondent contradicted this. On November 16, 1916, O'Reilly told respondent his counsel advised him he couldn't pay her, or any one, any more rent money "unless the matters were settled up and they" (respondent and Mrs. Grant and Mrs. Simcoke) "came to some conclusion," and procured her to sign the following letter, addressed to him:

"Until further notice you may continue to pay to the beneficiaries the proportions mentioned in the will of Mary J. Torwegge, deceased. I am informed that I am entitled to a greater portion, but for the present and without committing myself, you may make payments as above requested, until I notify you differently."

The executor thereafter paid in conformity to this letter for a month or so. Later in November respondent and Mrs. Grant and Mrs. Simcoke seem to have visited the executor's office and then, it appears, respondent suggested she would like to have a little more than the thirty dollars per month given her by Mrs. Torwegge's will. On December 5, 1916, the parties again went to the office of the executor and the executor caused to be prepared the following memorandum:

"For and in consideration of the sum of sixty dollars to me paid by Mabel Grant and Laura Simcoke, the receipt of which is hereby acknowledged, and the further sum of twenty dollars per month to be paid me each and every month for twenty-one consecutive months commencing January 1st, 1917, I hereby agree to abide by the terms of the last will and testament of Mary J. Torwegge, and do agree to execute any necessary papers to straighten up the titles to any real estate left by the said Mary J. Torwegge so as to conform to said will, and also to execute a quitclaim deed for the real estate that was disposed of by Mary J. Torwegge prior to her death, in which I may have had an interest.

"I am thoroughly conversant of the fact that I am entitled to a greater portion than that mentioned in the said will of Mary J. Torwegge, deceased, but desire to abide by the terms of said will.

"LILLIE MAE TORWEGGE."

After respondent signed this he took her before a notary and had her acknowledge it. He says she never told him she consulted a lawyer but said her friends "advised her not to do that; that she was a fool to do that," i. e. make the "settlement" set up by appellants; that she told him this "whenever the subject-matter was

brought up; she said it repeatedly.'' On the same date, December 5, 1916, Mrs. Grant and Mrs. Simcoke signed a paper, directed to the executor, in which they authorized him to pay ''over to Lillie Mae Torwegge the sum of $20 and charge the same to our share of the rents coming from the Mary J. Torwegge estate. Do this each and every month for twenty-one consecutive months.'' Respondent had previously been told she could not be paid anything more than the thirty dollars per month mentioned in Mrs. Torwegge's will unless she had a settlement or arrangement with Mrs. Grant and Mrs. Simcoke, of some kind. Prior to the discovery of the deed of adoption the executor had paid out the rents in accordance with the terms of Mrs. Torwegge's will, both those from her property and those from the property left by her husband. This amounted to some $1,500. After December 5, 1916, payments were made in accordance with the papers then signed. Subsequent investigation disclosed that Mrs. Torwegge had filed no election and that the idea that respondent was entitled to only one-half of the property of Francis W. Torwegge was incorrect, since it was based upon an assumption not true in fact. It nowhere appears why the assumption was acted upon and the fact so long left uninvestigated. The discovery was made by the attorney for the executor, who, as stated, had brought to light the deed of adoption recorded sixteen years before in St. Louis County. After this second discovery and its communication to the executor he says he promptly advised Mrs. Grant and Mrs. Simcoke and respondent thereof and also advised respondent ''to consult with her friends and counsel.'' He says she replied she did not like to go into court, and he told her that was not necessary, ''that the law gave her those rights.'' ''Those rights'' he had just described as ''a far greater share of the estate than he'' (counsel) ''at first thought.'' Mrs. Simcoke testified the executor told respondent in March that the papers signed in December would ''probably not be of any value,'' and then said to her and Mrs. Grant and respondent: ''Now, if

you are all of the opinion that you want to continue doing as you did, then new papers will have to be drawn up;'' that he told respondent he wanted her to think it over, there was no hurry, and if she wanted counsel he would be glad to get it for her. Mrs. Grant testified that the executor told respondent that she "was entitled to practically the whole estate . . . and that she would have to think this matter over and that the matter was up again for settlement" and to consult her friends and a lawyer, if she wished.

Thereafter the executor caused the following letter to be prepared and respondent signed it:

"St. Louis, April 4, 1917.

"Mr. G. B. O'Reilly,

St. Louis, Mo.

"Dear Mr. O'Reilly:

"From what you tell me I now understand that I am entitled to a much greater proportion of the estate of my deceased mother, Mary J. Torwegge, than was at first thought. My father having died leaving a will in which no mention was made of me virtually only left a life interest in his estate to my said mother. My mother should have elected to have taken a child's interest in my father's estate within one year after the death of my father. Having failed to do this she received, as stated before, only a life interest, which interest died with her. I am, therefore, entitled practically to the whole estate.

"Feeling, however, that I desire to carry out the will of my mother with some slight changes, I would be willing, in consideration of receiving $20 per month for five years from this date to be paid me by Laura Simcoke and Mabel Grant, to carry out the terms of the will.

"The clause in the will which states that in the event of my death before the age of thirty, that my share of the estate is to go to the said Laura Simcoke and Mabel Grant, is obnoxious to me, and I would prefer that this be changed so that in the event of my death if married prior to reaching the age of thirty, that I shall do as

I wish with my part of the estate, and will it to whomever I wish, also that I have a voice in the sale of the real estate.

"I desire you to employ competent counsel so you may be guided in order that my best interest shall be taken care of along the lines above stated, although I know that I could claim practically the entire estate.

"Yours truly,

"LILLIAN M. TORWEGGE."

The executor says he thereupon employed for her the same counsel who had been acting for him and who had prepared the letter just set out. On April 14, 1917, respondent and appellants appeared and a formal agreement was signed by Mrs. Simcoke and Mrs. Grant as "first parties" and respondent as "second party," whereby the "first parties in consideration of one dollar and other good and valuable consideration" agreed to pay to respondent $20 per month, beginning October 1, 1918, and set over to the executor their interest in a $4,000 note to secure such payments. This was acknowledged. The alleged agreement of respondent with appellants is not directly mentioned. Respondent and Mr. and Mrs. Simcoke and Mr. and Mrs. Grant executed a quitclaim to one Kenny, a straw man, which conveyed to him all the realty left by Francis. W. Torwegge except the tract Mrs. Torwegge had attempted to sell to Lahrman. Kenny then conveyed two-thirds of this to Mrs. Simcoke and Mrs. Grant and the other one-third to the executor in trust for respondent. The deed provided the trustee should collect the rents and, after deducting expenses, should pay respondent $30 per month and hold the balance in trust for her until she became thirty years of age and then the trust property to be delivered to respondent "provided, however," that if respondent should marry and then die before attaining the age of thirty, she could dispose of the trust property, but if she died, unmarried, prior to reaching thirty the property should go to "Mabel Grant and Laura Simcoke, absolutely, share and share alike." At the same time and after she was

told it was necessary to "clear the title," respondent executed a deed to Lahrman for the county tract Mrs. Torwegge had attempted to convey.

The evidence shows, by a strong preponderance, that respondent had no independent counsel or advice with respect to the transaction which the parties refer to as the "settlement" between her and Mrs. Grant and Mrs. Simcoke, and that appellants knew it. It is beyond dispute that the attorney employed for her by the executor under the letter of April 4, 1917, was not employed to advise her as to that agreement and did not volunteer to do so. With respect to that it is entirely clear that the executor presented the matter to counsel as a family settlement which had already been agreed upon and required of him nothing except to prepare the documents necessary to carry it out according to the executor's version of it. This the attorney did in accordance with what the executor told him. The evidence is also clear that no one ever explained or stated to respondent what the property was with which she was dealing or what its value was, and she was not at any time told that she was entitled absolutely to all of the real property which Francis W. Torwegge left. From one of the appellants it appears that respondent was probably left under the impression that the will of Mrs. Torwegge was "irregular." Nor does it seem to have been explained to respondent what interest she had in the tract, worth about $12,000, which Mrs. Torwegge had attempted to convey to Lahrman.

I. The validity of the deed of adoption is drawn in question by appellant's contentions. There is no dispute about the statutory origin of adoption of children and little, if any, concerning the meaning of our statute prior to the amendment of 1899. Upon this amendment appellants base their principal objections to the deed. Prior to 1899 the applicable sections (5246, 5247 and 5248, R. S. 1899) provided:

*Children: Deed of Adoption.*

"Sec. 5246. If any person in this State shall desire to adopt any child or children as his or her heir or dev-

isee, it shall be lawful for such person to do the same by deed, which deed shall be executed, acknowledged and.recorded in the county of the residence of the person executing the same, as in the case of conveyance of real estate.

"Sec. 5247. A married woman, by joining in the deed of adoption with her husband shall, with her husband, be capable of adopting any child or children.

"Sec. 5248. From the time of filing the deed with the recorder, the child or children adopted shall have the same right against the person or persons executing the same, for support and maintenance and for proper and humane treatment, as a child has, by law, against lawful parents; and such adopted child shall have, in all respects, and enjoy all such rights and privileges as against the persons executing the deed of adoption. This provision shall not extend to other parties, but is wholly confined to parties executing the deed of adoption."

Another section permitted the probate court to change an 'adopted child's name, and another gave the county court certain powers in the case of children of habitually intemperate, immoral or inhuman parents. These sections are not involved in this case. There seems to be no controversy here about the meaning of the quoted sections as they stood in 1899. Those sections had at that time been construed to mean that any competent person might adopt any child and constitute it his heir by following the method the statute prescribed; the consent of the natural parents was not required in order that this much might be accomplished (Reinders v. Koppelmann, 68 Mo. 1. c. 495 et seq.); and the adoptive parent was not entitled, as against a parent, to the custody of the adopted child by the mere act of adoption, but could become so only by the legal consent of one entitled to dispose of the child's custody. [In the Matter Chas. B. Clements, 78 Mo. 1. c. 353 et seq.; Clarkson v. Hatton, 143 Mo. 1. c. 54.] These statutes had been the same in words and in construction for many years prior to the amendment of 1899. Any child could, under them, be

adopted, so far as necessary to confer upon it a right to inherit from the adoptive parent, by any competent person, and this without the need of the consent of the child's natural parents or of any court or other authority. With the law in this condition homes began to be instituted for neglected, ill-treated and abandoned children. [Chap. 35, R. S. 1899.] These could be and were incorporated under Article II of Chapter 12, Revised Statutes 1899. See Section 3537, Revised Statutes 1899. These societies had no authority under the then law to release the rights of the natural parents of the children they sheltered. The incorporation of training schools for homeless, friendless and dependent minors had theretofore been authorized. [Sec. 1473, R. S. 1899.] These schools were empowered to place such children in the homes of "good citizens" who would adopt them, but no clear authority was given to them to attempt to confer custody of such minors to the exclusion of the natural parents. The right or privileges given by the sections quoted might be exercised in the case of any child. In the case of children whose natural parents were living the adoption might be supplemented by a lawful transfer to the adoptive parent of the legal custody of the child. In the case of homeless and abandoned children, whose parents were dead or could not be found, disposition of the legal custody could not so easily be made. In view of the fact that many adoptions are the result of a desire for the society and affection of a child, the result was that the class of children most in need of the care of adoptive parents must have been, to an extent at least, less likely to secure adoption because of the fact that custody of their persons could not certainly be obtained. There were doubtless individuals who conducted institutions for the care and custody of children who were under like disabilities and whose wards were, by this state of things, denied the same opportunities.

In 1899 the following was enacted:

"Whenever any minor child below the age of seven years, intrusted by its parents or either of them to the

care and custody of any legally incorporated institution in this State for the care and custody of minor children, or to any individual who may conduct such an institution, shall have been abandoned by such parents for a period of two years, or whenever such institution shall have received therein for care and custody, a minor child of the age aforesaid, which thereafter shall have been abandoned by its parents for a period of two years, such institution may, by its principal officer, and by and with the approval of the probate court of the county or city in which such institution is located, execute a deed of adoption with all the force and effect of a parent, to any proper person or persons in this State, who shall desire to adopt such child, and who shall join in the execution of such deed for that purpose; and such deed shall be executed, acknowledged and recorded in the county or city wherein such institution is located, and from and after the time of filing the same with the recorder, the child or children adopted as aforesaid, shall have and be entitled to all the rights of lawful children against their adopted parent or parents, and such adopted parent or parents shall have and be entitled to all the rights of lawful parents against such adopted child or children, to the exclusion of any rights of its lawful parents.''

It will be observed that this section quite definitely describes the children to which it was intended to apply. Before a child could fall within the terms of this section it (1) (a) must have been intrusted by its parents or parent to some incorporated institution for the care of minor children, or (b) to some individual who conducts such an institution; or (2) received by such institution in some other way for care and custody; and then (3) must have been abandoned by its parents for two years; and, also, (4) must have been less than seven years of age. Reception for care and custody, abandonment for two years by the parents, and an age of less than seven years are conditions precedent to the exercise by the institution of powers which the section confers: The deed of adoption which the Torwegges signed shows the fact

.to be that respondent was born February 9, 1898; that she was intrusted to the Benevolent Association in June, 1899, and that the deed itself was executed in January or March, 1900. The deed therefore shows that the child had not been abandoned by the parents for a period of two years before that deed was executed. A knowledge of law is imputed to the Torwegges. They, therefore, knew that the Association had at the time no power to give such consent to their adoption of respondent as would exclude parental rights, because one condition precedent to the exercise of such power did not exist. It is necessary to conclude, therefore, that the Torwegges were not attempting to proceed under the section upon which appellants rely. The deed of adoption contains further evidence of the same thing. It recites the facts already stated, and then recites that a writing had been executed whereby, on June 26, 1899, there was conferred upon the Association "the right to secure for said child a home in a good family on the most favorable terms possible, including legal adoption, indenture and such other conditions as circumstances shall make possible or necessary." Without regard to the question whether such a writing ever in fact existed, it is clear that this recital is a perfectly useless and needless one if the parties were in fact proceeding upon the theory that the section enacted in 1899 covered the case and authorized the course pursued and was the legal basis of the act of adoption in which they were then engaged. The child was not within the terms of the section. The Torwegges knew it because they recite in their deed the facts which show it beyond contradiction and because in their same deed they found their right to the expected custody of respondent upon a reason wholly independent of the facts necessary to such a right under the statute in question. It, therefore, conclusively appears that respondent was not, in January or March, 1900, a member of the class to which the Act of 1899 applied and that the Torwegges knew that fact and executed their deed without regard to the existence of that act. There is nothing in that sec-

tion which has any tendency to exclude from the operation of the general statutes of adoption children who have been intrusted to homes but who have not otherwise, by abandonment and lapse of two years, been brought within the scope of the section. It would be a harsh rule at best if it were a rule, but it is one which has no foundation in the language of the section or any inference properly to be drawn therefrom. Further, the recital in the deed, signed by the Torwegges, that "by a lawful instrument in writing, entered into on the 26th day of June, 1899" there had been conferred upon the Association authority to secure for respondent a home in a good family "including legal adoption," not only shows that the Torwegges were not relying upon custody derivable through authority under the amendment of 1899, but is evidence of the existence of the writing described in the recital and justified a finding that it did exist, in fact and law, and conferred the power stated. This is confirmed by the fact that the Torwegges retained custody of respondent during the remainder of their lives.

The position that the deed of adoption is void for want of consideration is not tenable. This appears from what has already been said with respect to what the Torwegges contracted for and what they received under the deed. Under authorities already referred to no contract for custody of the person of the child is essential to the validity of a deed of adoption. The adoptive parent might, without the natural parent's consent, confer upon such child a status of heirship which, in itself, would constitute a sufficient consideration for the benefits flowing therefrom to the adopted child. The decision in Fugate v. Allen, 119 Mo. l. c. 190, 191, is not applicable. In that case the consideration of the deed of adoption, as the court construed it, was the custody of the child. The father, whose promise to confer such custody upon the adoptive parent was held to be the very foundation of the deed, had no legal authority, by reason of a decree of court, to dispose of that custody. The court held the consideration of the deed therefore failed.

In this case, as already pointed out, the Torwegges received all they contracted for as consideration of their deed. If it be said respondent's mother had no legal right to authorize Mrs. Hayne to confer the custody of respondent upon the Torwegges, it must be held that this is a question of fact, and it nowhere appears that respondent's father was living, nor that, if living, the courts had not conferred upon the mother the custody of respondent. There is one other situation in which the mother would be authorized to act alone. That this situation existed is neither affirmed nor denied. The Torwegges contracted for just what custody the Association could confer. This they received. A knowledge of the law is imputed to them, and appellants did not attempt to prove that a condition existed, in fact, which denied the mother the right to that custody. The deed of adoption is valid.

II. Upon the question of the validity of the "settlement" it is not thought necessary to review the authorities. They can be found in the briefs which accompany this opinion. That the trial court was right in setting aside this arrangement seems clear. Respondent had barely attained the age of eighteen. She was without business experience and had little education. Her manner of life had been such that it is probable

**Settlement Invalid.** the thirty dollars per month she began to receive seemed like a small fortune. Her property had been put in the hands of a man she trusted and whom her adopted mother, to her knowledge, had intrusted with her own interests for years previously. She had her first information of her legacy from him and he began to pay her the income of thirty dollars per month provided by the will of Mrs. Torwegge. He also began to pay to Mrs. Grant and Mrs. Simcoke, each, one-third of the income on all the property of which Francis W. Torwegge died seized. They had no sort of interest in any of that income, and the executor had no legal right to intermeddle with it. He was trustee for respondent

under Mrs. Torwegge's will, but this gave him no real
authority with respect to the other property.. He paid
out to Mrs. Grant and Mrs. Simcoke a good round sum
to which they were not entitled, and for which he thereby
became liable to respondent. Then the deed of adoption
was discovered. In this situation the executor did not
lay the facts frankly before respondent or before any
one who was authorized to represent her. Instead, he
first notified Mrs. Grant and Mrs. Simcoke. Respondent
was then visiting in Texas. The executor was exchang-
ing letters with her, but he did not mention to her the
discovery which had been made, although he was moved
to send her a present of a little extra money. Mrs. Grant
and Mrs. Simcoke did not advise respondent of the change
in conditions, although one of them, at least, wrote her
at her temporary Texas address. On the contrary, the
executor told Mrs. Grant and Mrs. Simcoke that he could
not pay them any more money until they had a settle-
ment with respondent. Mrs. Grant and Mrs. Simcoke
then prepared to interview respondent on her return.
Upon her return they told her something must be done;
that none of them could get any more rents until some
arrangement was made. She was met by them and the
trustee, the executor, with a suggestion of a "settle-
ment" and that idea was persistently kept before her
until the last deed had been executed. Respondent had
never been told what property was involved, nor what its
value was, nor that she owned all the property left by
Francis W. Torwegge without any necessity for any
"settlement" or arrangement of any kind with any of
the appellants. She was not even told (while that was be-
lieved) that *half* the property left by Francis W. Tor-
wegge was hers absolutely, and that her rents from that
half would amount to three or four times the sum pay-
able to her under Mrs. Torwegge's will and leave her
still entitled to the payments under the will, with ample
funds, apparently, to pay them. Even when, somewhat
disillusioned perhaps, as to the sufficiency of thirty dol-
lars per month to supply her needs, she made her pitiful

request for "a little more" than that sum, she was led to believe it must come from Mrs. Simcoke and Mrs. Grant, and, with effect to give substance to this and confirm to her mind the idea that she could get nothing more unless a settlement was made, it was actually arranged, whatever the intent, that Mrs. Simcoke and Mrs. Grant should pay respondent twenty dollars per month for a period. Incidentally they were receiving from respondent's property rents many times this sum, and the settlement also gave them the fee to two-thirds of it and a reversion in the other third. The letters and papers which respondent was induced to sign are a little unusual. They evidence some anxiety not explicable upon a theory of a consciousness that the transaction was one without extraordinary features. These were all caused to be prepared by the executor. They wear the aspect of a rather labored effort to prepare against a possible situation such as has arisen. Respondent signed certain deeds. These were in furtherance of the same "settlement." She was caused to convey to a straw man, Kenny, all her property. The executor had Mrs. Grant and Mrs. Simcoke and their husband sign this deed. Kenny then conveyed two-thirds of the property to Mrs. Grant and Mrs. Simcoke, absolutely, and one-third he conveyed to the executor, as trustee, for respondent, out of the income of which ($800 or $1,000 per annum) respondent was to be paid thirty dollars per month, The remainder of the income was to accumulate until respondent became thirty years of age when the whole would become hers, unless she married and died before attaining that age, in which event she might appoint. If she died before reaching the age of thirty and without having married, the whole was to go to Mrs. Grant and Mrs. Simcoke, absolutely.

The execution of the deed to Kenny by the Grants and Simcokes was wholly needless to convey respondent's property. It had no effect other than to maintain and deepen the impression that a "settlement" was in progress and that it was done, in part, to "straighten the title." It is strange if this transaction was fair and

above board, as appellants contend, that this young girl was not at some time, either orally or in some of the many documents presented to her to sign, frankly told that all the property was hers and what its value was so that she could compare its value with the $1680 (far less than a year's rent on the property) she would receive during the several years the promise of Mrs. Simcoke and Mrs. Grant had to run. It may have been feared that a comparison of this sum with the thirty or forty thousand dollars' worth of property respondent was, in result, turning over to them would not forward the "settlement" then in hand.

Further, it was known that respondent had no independent legal advice. The executor knew she had authorized him to employ counsel for her. He employed counsel and, the evidence shows, employed him solely to draft the instruments respondent signed. These deeds and papers were drawn at the executor's direction. The executor had presented the matter to counsel as a consummated arrangement needing only the documents which were signed to give it effect. He prepared these as directed by the executor and presented them to respondent for her signature at the meeting of the parties. He did not offer to advise her as to her rights. The executor makes it clear he did not employ counsel to do that, and the record makes it clear that counsel had no reason to suspect that he was employed to represent respondent or that the executor and others were using the documents he had drawn for any purpose with respect to which question could arise.

It is difficult to escape the conviction that this whole scheme had its inception in the fear of the executor that the sums he paid out to Mrs. Grant and Mrs. Simcoke out of the rents of respondent's property would have to be accounted for by him. After this, the thing grew, little by little, into the transaction this record clearly depicts and the law as clearly condemns. The executor testified his attorney told him, and he told respondent of it, that he could not advise respondent in any way since he was

"her trustee." That he may have been advised that he could not urge upon respondent such a settlement as was attempted is probable. That he was told he might not warn her or, at least, disclose to her the value of the property she was giving away is so unreasonable as to be beyond belief. That the advice he got was probably a warning or a rebuke elicited by a suggestion from him of a method to avoid liability he thought he had incurred for rents paid over by him without authority is strongly suggested by the record. This would account for probably all the "advice" he received on this subject. Mrs. Grant and Mrs. Simcoke do not seem actually to have undertaken any conscious wrong, but they received the fruits of what was done, and equity will not permit them to retain them.

In the circumstance the trial court was right, and its judgment is affirmed. All concur.