292 S.W.2d 562 (1956)
Matter of Marjie Lee MAYERNIK, a Minor.
Clarence L. HAGEMANN et al., Respondents,
v.
Shirley Jean AMBROGIO, Appellant.
No. 45115.
Supreme Court of Missouri. Division No. 1.
July 9, 1956.
*563 Marvin Q. Silver, Milton Suffian, St. Louis, for appellant.
*564 A. Ivon Lodge, Raymond T. Percich, St. Louis, for respondents Clarence L. and Elsie A. Hagemann.
VAN OSDOL, Commissioner.
This is an appeal from a decree of adoption, and from an order denying an application for the revocation of a natural mother's consent to an adoption and for the restoration of the custody of her child to her. Herein, appellant, the mother, has raised the contention, among many others, that the Adoption Code, Chapter 453, RSMo 1949, V.A.M.S. (particularly §§ 453.030, 453.040, and 453.050 thereof), is unconstitutional.
April 9, 1953, Shirley Jean Ambrogio, formerly Mayernik (hereinafter sometimes referred to as "appellant"), the mother of the minor child Marjie Lee Mayernik, executed her consent to the transfer of custody, and to the adoption of the child by Clarence L. Hagemann and Elsie A. Hagemann, his wife (hereinafter sometimes referred to as "respondents"). The consent was in language in part as follows, "And I do hereby consent to the transfer of custody and to the adoption of said child, Marjie Lee Mayernik, so that said child, for all legal intents and purposes shall be and become the child of said Clarence L. Hagemann and Elsie A. Hagemann as if born to them in lawful wedlock; and I further consent that the name of said child be changed to Patricia Ann Hagemann." The instrument of consent was duly acknowledged. March 9, 1953, Charles Paul Mayernik, Jr., the father of Marjie Lee, had signed and acknowledged a like instrument. These instruments were filed in the Circuit Court of St. Louis County (Juvenile Division), April 24, 1953.
Respondent Elsie A. Hagemann is the paternal great-aunt of Marjie Lee. The child had been received by the Hagemanns, and had been cared for by them in their home in St. Louis County since February 17, 1953.
April 24, 1953, the Hagemanns filed their petition for the transfer of the custody of the child to them, which petition alleged the fact that the natural parents had executed their consents to the transfer of custody of the child to the Hagemanns for adoption. The Hagemanns further stated in their petition "that they are desirous of obtaining the lawful and actual custody and control of said child for a period of at least nine months as it is their intention after said time to petition for the adoption of said child." July 24, 1953, the court entered an order reciting that evidence had been adduced, and the court, being duly advised, sustained "the petition for the transfer of custody of said Marjie Lee Mayernik, as prayed." It was ordered that the custody of the child be transferred to the petitioners "under the supervision of Child Welfare Services."
July 8, 1954, the mother Shirley Jean filed her petition for an order permitting the withdrawal and revocation of her consent to the adoption, and for an order restoring the custody of the child to the petitioner. May 18, 1955, respondents Clarence L. Hagemann and Elsie A. Hagemann filed their petition for adoption. May 24, 1955, a guardian ad litem was appointed. And June 1, 1955, a hearing was had on the petition for the revocation of appellant's consent to the adoption, and on the petition of the Hagemanns for the adoption of Marjie Lee. The court heard the evidence on the issues raised by both petitions at the same hearing and, being advised in the premises, denied appellant's petition for the revocation of her consent, and sustained respondents' petition for adoption. It was decreed that the child Marjie Lee should "to all legal intents and purposes, be the child of petitioners, Clarence L. Hagemann and Elsie A. Hagemann, his wife," and that the child's name should thenceforth be Patricia Ann Hagemann.
In her brief, appellant Shirley Jean has stated twenty-two points supporting contentions of error in denying her petition *565 for the revocation of her consent and in rendering the decree of adoption. However, she says that, although she has raised numerous allegations of error and the points are multiple, they can be confined to a few general categories. Some of appellant's contentions require an examination of the circumstances in which appellant executed the consent for adoption, and of the evidence bearing upon the welfare of the child.
Marjie Lee Mayernik was born to Shirley Jean and her husband, Charles Paul, October 9, 1948, in Detroit, Michigan. Shirley Jean was divorced from Charles Paul, April 3, 1951. She was given the care and custody of Marjie Lee, and was to receive from the father $10 a week for the child's maintenance. The divorce decree was to become final six months after the entry thereof. August 29, 1951, Shirley Jean was married to her present husband, Joseph Ambrogio, in Angola, Indiana. She and her husband testified the Indiana marriage was annulled; but they say they continued to live in common-law relationship. The annulment was at the instance of Joseph's mother, who was averse to her son's marriage to a divorced woman, absent ecclesiastical sanction. Shirley Jean and Joseph were remarried ceremonially May 29, 1954. Two children, a son and daughter, have been born to the marriage of Shirley Jean and Joseph.
At the time of the Indiana marriage in 1951, the husband, Joseph Ambrogio, was employed by his father and mother as a bartender in the parents' tavern. He received no wages or salary until 1953. He testified most of his pay was withheld by his mother. He said the mother was intending to use the accumulated moneys to buy him a home. After the marriage in 1951, Joseph asked his mother for wages and for some of the money she had put aside for him, but "she didn't like my wife at that time and she (his mother) wasn't for it and I didn't want to hurt her * *." Meanwhile, appellant and Joseph lived in rented apartments which were not available to families with children, and since Joseph had little expendable income, Shirley Jean worked. The child, Marjie Lee, was kept and cared for by various women, including a Mrs. Whitford, whom appellant employed. Appellant paid these women out of her wages and the $10-per-week maintenance allowance. It seems that her wages, the maintenance allowance and a $66-per-month pension to Joseph for wounds received in military service were the only moneys then available to defray the living expenses of Joseph, Shirley Jean and Marjie Lee.
In early 1953, Shirley Jean was pregnant, and Mrs. Whitford could no longer "watch" Marjie Lee. Shirley Jean testified that she called on everyone for assistancethe doctor, the priest, the former husband, and finally the mother of the former husband, paternal grandmother of Marjie Lee. Appellant testified that the grandmother suggested that the grandmother's sister, respondent Elsie, might care for Marjie Lee. Appellant telephoned Elsie who consented to take Marjie Lee with the understanding that she and her husband were to adopt the child. Appellant and her former husband visited the "Friend of the Court" in Michigan and agreed that the $10-per-week maintenance allowance should be discontinued and that Marjie Lee should be taken to St. Louis to be adopted. The Friend of the Court advised that a copy of the final adoption decree should be exhibited in Michigan.
Marjie Lee was taken to St. Louis by her grandmother Mayernik. As stated, the child was received in the Hagemann home, February 17, 1953. Subsequently and prior to April 9, 1953, Joseph and Shirley Jean journeyed to California to stay with Shirley Jean's father. They were almost entirely without funds. They drove a car for a "drive-away" and slept in the vehicle. Shirley Jean had been provided with a "consent for adoption"; but she testified she did not execute the instrument at the time, as she *566 hoped her father in California would assist her. When Joseph and Shirley Jean arrived in California they found that Shirley Jean's father was ill and unable to work regularly. Shirley Jean's consent to the adoption was executed in California and mailed to St. Louis County. With some money Joseph earned and with a little help from Shirley Jean's father, Joseph and Shirley Jean returned to Detroit in late April, 1953; and Joseph's mother, when she became advised that Shirley Jean was pregnant, changed her attitude, and began to pay Joseph a salarysomething like $200 or $225 per month. Joseph continued to work for his parents until about one month prior to the revocation and adoption inquiry, when he was employed by Stroh's Brewery Company in the bottle shop at take-home pay of $79 for a five-day week.
Shirley Jean testified that in the latter part of 1953 she importuned Elsie for the return of Marjie Lee"I told them Joe and I would pay her for the back care she had given Marjie, but that we couldn't pay it all in one lump sum, we could pay some; she said she didn't see how we could possibly raise that much money because they spent so much on her and friends had given her so much and she thought Marjie was very happy there and would be better off there." (When testifying, respondent Elsie remembered that in June, 1953, Shirley Jean had requested the return of Marjie Lee. Elsie informed Shirley Jean that, to a certain extent "there were certain complications about giving her back." The one and only complication was that the Hagemanns "had received a lot of gifts" which would have to be returned, and some of the gifts had been used and the Hagemanns would have to pay for them. Elsie denied she had discussed money in her conversation with Shirley Jean. All she "mentioned was the gifts." Respondent Elsie further testified that she and her husband loved Marjie Lee and felt that the child was happy in the Hagemann home.)
Sometime in the late spring of 1953, Shirley Jean had been communicating with a Mrs. Lodge, a representative of the St. Louis County Child Welfare Services, with the view of withdrawing the consent for adoption. But on June 17th, approximately five weeks before the hearing and transfer of custody order of July 24, 1953, Shirley Jean wrote a letter to Mrs. Lodge, as follows, "I telephoned you and said I wished to withdraw my consent. Since then I have spoken to Mrs. Hagemann and I feel it would be unwise to move Marjie again. Mrs. Hagemann convinced me she was very happy there and becoming adjusted to her new home. So please continue as though I hadn't called." At the time, Shirley Jean became reconciled to the adoption; but later, January 20, 1954, having learned from her former husband that the adoption had not been consummated, Shirley Jean wrote a letter to the Juvenile Division of the Circuit Court of St. Louis County requesting information with the view of withdrawing her consent to the adoption, to which letter the Chief Probation Officer of the Juvenile Court replied by letter dated January 26, 1954, advising that a petition for the transfer of the custody of Marjie Lee had been filed April 24, 1953, and that a hearing had been held on the following July 24th, after which the court had transferred the custody of Marjie Lee to the Hagemanns. In the letter the officer further advised her that if she took no action prior to the expiration of a nine months' "waiting period," the writer was of the opinion that the court would grant a decree of adoption to the Hagemanns. Shirley Jean's immediate action in consulting an attorney was suggested. Shirley Jean testified that after the receipt of the letter of January 26th, she engaged the services of counsel in St. Louis, and filed her formal petition (July 8, 1954) for revocation of the consent and for restoration of Marjie Lee to her.
Shirley Jean and Joseph and their two small children now (at the time of the hearing, June 1, 1955) reside, rent free, in the second-floor apartment of a flat. Joseph's brother and wife and their two children *567 reside "downstairs." The title to this property is vested in Joseph's mother.
Both Shirley Jean and Joseph express their desire for Marjie Lee's return to them. They believe that Marjie Lee's best interests would be served by returning her to the family consisting of her mother, stepfather, half-brother and half-sister.
There was evidence introduced by respondents that, when Marjie Lee was brought to St. Louis in February, 1953, she was very nervous and looked as if she lacked security. She "took to" the Hagemanns at once. A clinical psychologist (to whom Marjie Lee was taken for examination at the request of Child Welfare Services of St. Louis County as a part of the general adoptive study made by that agency) testified that she examined Marjie Lee June 15, 1954. The child had "some evidences of earlier deprivation and anxiety" but she had developed resources "and had adjusted well in the home in which she was now living" and had developed "a close attachment to her foster parents and that they had invested heavily in her and she in them in terms of emotion and in terms of inter-relationships." The witness felt the "placement" was a good one, and that the child was doing well in the Hagemann home.
Respondent Clarence L. Hagemann, thirty-eight years old, stated he has owned his home since 1944. The property is worth about $14,500, and he has an "equity" in it of about $12,000. It is a five-room bungalow, fully furnished. He also owns an automobile, and an unimproved acre of ground on Lindbergh Boulevard worth about $4,000 and unencumbered. He has been employed since 1941 by the U. S. Government as a postal clerk. His "take-home pay" is roughly $144 twice a month. A social worker of the Child Welfare Services had recommended that respondents procure additional insurance, and also recommended an examination of Marjie Lee by a psychologist. The Hagemanns followed this advice. The Services also advised that Marjie Lee needed some minor surgery, which respondents have caused to be performed.
The Hagemanns are active church members. Marjie Lee regularly attends Sunday School. She attends school. The school bus stops at the front door. Marjie Lee leads her class in scholarship; and is happy and adjusted to her new life in the Hagemann home.
We shall have occasion to examine other evidence in the further course of this opinion.
We shall now attend appellant's initial contention of the unconstitutionality of the Code. In reviewing such contention, we shall also examine some of appellant's other contentions which are inter-related with her initial contention, and the rest of her contentions are to be examined in the further course of the opinion.
As stated, it is contended the "consent section" of the Code (originally Section 9609 as enacted in 1947, Vol. II, L.1947, p. 214, and divided without material change into three sections, §§ 453.030, 453.040, and 453.050, in the 1949 Revision) is unconstitutional. It is said to be violative of Art. 1, §§ 2 and 10, Const., V.A.M.S., and of the Fifth and Fourteenth Amendments of the Constitution of the United States.
Appellant asserts the "consent section" is new. It is said it is not only new, but it is novel; it permits a parent of a minor child to execute his consent to a present or to a future adoption of said child by the execution of a written consent in the same manner as one would execute a conveyance of real estate; such a consent purports to generally bind the parent of said minor to an adoption of his child, and this may be to either a specific adoption or to an adoption not yet contemplated; it in effect divests a parent of his natural rights to the custody of his minor child even though no legal proceedings are then pending and even *568 though no legal proceedings may ever be instituted; and by a "conveyance type" of instrument it unilaterally binds a parent of a minor to the future adoption of his child without process of law or any legal proceedings. It is further said that a minor child must await a future decision as to his status, dependent solely upon the will or even the whim of the prospective adoptive parents who ultimately may or may not desire to adopt him, yet he is bound in virtual servitude to them by the written instrument of consent, and his parent or parents cannot irrevocably regain his custody because they have executed an instrument which may or may not in the future be used in legal proceedings, adoptive or otherwise; and when and if these proceedings are commenced, no notice of such proceeding is provided for to the minor's parents, all of which it is said are violative of fundamental human rights.
In the first point stated in her brief, appellant alluded to § 453.040 as validating a "consent to a future adoption." But, at the outset, we should like to point out a differentiation manifest in the language of the Code between a parent's "consent to the adoption" and a parent's waiver of "the necessity of his or her consent to a future adoption." §§ 453.030, 453.040, and 453.050, supra. In this case, the natural parents consented to an adoption by the Hagemanns. The consent was to an adoption by named prospective adoptive parents. The instruments the natural parents signed were not waivers of the necessity of their consent to a future adoption. Of course, the adoption in our case awaited the decree of adoption upon the final approval thereof, which approval could be given (or refused) upon application or petition and hearing, and a decree rendered only after the prospective adoptive parents, petitioners, had had the lawful and actual custody of the child for a period of at least nine months prior to the entry of the decree of adoption. § 453.080, RSMo 1949, V.A.M.S. In the application for the transfer of custody, the petitioners, the Hagemanns, recognized this required nine-months provisional period, and stated their intention "after said time to petition for the adoption of said child."
We have also noted that appellant has referred to the prescribed written consent of the natural parent as a "conveyance type" of instrumentsuch as one executes in transferring title to lands. It is true that such a consent is required to be in writing and acknowledged as conveyances of real estate are required to be or, in lieu of the acknowledgment, the signature of the person giving such written consent is to be witnessed by the signatures of at least two adult persons. Subsection 3, § 453.030, supra. The instrument, indeed, is a solemn one; and clearly the execution of it should be by the parent, and as the voluntary act of the parent. But we have no doubt the mere provision requiring the stated formalities of execution does not carry the intendment that the instrument even so formally executed is irrevocable in its effect in all cases.
It has been said that even statutes which provide that the consent of the natural parent is not necessary to an adoption are constitutional, if the best interests of the child require adoption; but assuredly the legislature has no constitutional power to authorize one person, even though acting from motives of charity or benevolence, to transfer to himself at his own election the custody and control of the child of another. And a statute by which a parent could be deprived of his child without his consent or without notice and opportunity to be heard would, without doubt, be held void as an unconstitutional deprivation of right without due process of law. 2 C.J.S., Adoption of Children, § 5, pp. 372-374.
The Adoption Code of 1947 is a complete revision of our statutes on adoption. In this State, our courts in matters of adoption have had an anxiety to protect *569 the rights of natural parents, and adoption statutes should be strictly construed in favor of the rights of natural parents in controversies involving the termination of the relationship of parent and child. In re Watson's Adoption, 238 Mo.App. 1104, 195 S.W.2d 331; In re Adams, Mo.App., 248 S.W.2d 63. The Code of 1947 carries out this philosophy by requiring the consent (or waiver of the necessity thereof when permitted by court) of the natural parent to the adoption of a minor child, with some exceptions in which consent is not required. And in these exceptions, the Code strictly provides for process. §§ 453.030, 453.040, 453.050, supra; and § 453.060, RSMo 1949, V.A.M.S.; Cook and Eppenberger, The New Adoption Act, Vol. 4, J. of Mo. Bar 228 (Sept. 1948). The Code treats with adoption including legal custody of the child subject to adoption. Sections of the Code cited supra; and other sections of the Code, especially including § 453.110, RSMo 1949, V.A.M.S.; In re Adams, supra; In re Davis' Adoption, Mo. App., 285 S.W.2d 35. All of the sections comprising the Code are to be construed together in accordance with the manifest intention of the Legislature. In re Sypolt's Adoption, 361 Mo. 958, 237 S.W.2d 193; In re Davis' Adoption, supra.
In our case, Marjie Lee's parents executed their consents formally by writings duly acknowledged to the adoption of their child by respondents; and the court, acting upon the evidence introduced in support of the petition of respondents praying for an order transferring the custody of the child to them, which petition alleged the parents' consents ordered the transfer of the legal custody of the child to respondents in contemplation of an adoption. At this point we say the original custody proceeding designed to determine the propriety of the award of legal custody of the child to respondents who proposed to adopt her, may be considered a proper preliminary procedural step in adoption proceedings.
But, as stated, appellant filed her petition for an order permitting the revocation of her consent and for the restoration of the custody of the child to her. By clear intendment, this matter was subject to the court's sound discretionary action. Subsection 2, §§ 453.050 and 453.110, supra.
It is provided in Subsection 2 of § 453.050, supra, that any "waiver mentioned in subsection 3 of section 453.040, or the written consent to adoption by any parent, shall be valid and effectual even though such parent was under the age of twenty-one years at the time of the execution thereof, and any such waiver or consent shall be irrevocable without leave of the court having jurisdiction of the child given at a hearing, notice of which has been given to all interested parties." (Our italics.)
Considering now Subsection 2 of § 453.050, supra, it is seen that a consent executed by a parent is irrevocable without leave of court upon hearing, notice of which to be given to all interested parties. Here, it would seem obvious that since the statute says the consent shall be irrevocable without leave of court, the consent is revocable with leave of court. And such revocation by leave of court would seem to supply the remedial procedure and the answer to appellant's contention that the parents who have duly executed the required written consent to an adoption are unilaterally and irrevocably bound in all cases and that their child is bound in virtual servitude to the will or subject to the whim of the prospective adoptive parents. And it seems to us that appellant in filing her petition for the revocation of her consent to the adoption and for the retransfer of the custody of the child to her was availing herself of this very procedure.
Statutes pertaining to adoption in the 1939 Revision, Chapter 56, Article 1, R.S.1939, did not include language relating to the irrevocability of a consent except by leave, as does § 453.050, supra; and in a case involving the question of the right of *570 a parent to withdraw or revoke a consent to an adoption (which case arose prior to the enactment of the present Adoption Code in 1947, Vol. II, L.1947, p. 213), it was held that the natural parents (or parent) could withdraw their consent at any time prior to the decree of adoption. Application of Graham, 239 Mo.App. 1036, 199 S.W.2d 68, decided in 1946. This view is supported by the decisions of courts of several foreign jurisdictions. In some of these decisions it has been held the parent's right to withdraw or revoke consent before the decree of adoption is absolute, and is not dependent upon any showing of cause or reason. It has been written, however, that the trend of more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption, and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parent and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection have been forged between them and the child. See the Annotation, 156 A.L.R. 1011; and In re McKinzie's Adoption, Mo.App., 275 S.W.2d 365 (in which case the Springfield Court of Appeals has made a study of authorities treating with this question). See also Vol. 4, J. of Mo. Bar, supra, at page 229, where in 1948 it was said the case of Application of Graham, supra, is probably no longer law because of the provisions of the 1947 "consent section." It would seem that our present statute, § 453.050, supra (a part of the 1947 "consent section," as stated), particularly Subsection 2 thereof, contemplates that a parent's consent to an adoption, freely given and duly executed, may not be arbitrarily withdrawn by the parent, and that the court, whose ward the child is in any custody or adoption proceeding, has the discretionary power and responsibility of determining whether the consent should be revoked and custody of the child restored to the parent. In re McKinzie's Adoption, supra. And the court's sound discretionary action in this matter, as in other matters pertaining to adoption, should be governed primarily by considerations bearing upon the welfare of the child. State ex rel. Earnest v. Meriwether, Mo.Sup., 270 S.W. 2d 20; In re McKinzie's Adoption, supra.
The contention of unconstitutionality of the questioned Sections of the Code is ruled adversely to appellant.
We have recited that appellant had been awarded the custody of Marjie Lee when appellant was divorced from her former husband, and we have stated the evidence tending to show that it was agreed in the presence of the Friend of the Court in Detroit that Marjie Lee be brought to the Hagemann home in St. Louis County for adoption. We overrule appellant's point asserting that the Friend of the Court was a necessary party to the adoption proceedings and that the court erred in decreeing adoption without notice to him. The Friend of the Court in Michigan had not been awarded the legal custody of Marjie Lee, although one of his prescribed duties was to ascertain that the decretal allowance for Marjie Lee's maintenance was regularly received and duly applied for her maintenance. § 25.172, Michigan Statutes Annotated, Comp.Laws Mich.1948, § 552.252. At the time of the institution of the instant proceedings the power to render a decree in such proceedings was in the Juvenile Division of the Circuit Court, and the venue was in St. Louis County by virtue of statute. (§ 453.010, RSMo 1949, V.A.M.S.) Not only did respondents, the Hagemanns, reside in St. Louis County, Missouri, but Marjie Lee, the person sought to be adopted, was in that County in this State. Here, we have no case where a child, in circumvention of the jurisdiction of a court of a sister state, fraudulently *571 has been brought within our state to invoke the jurisdiction of our courts. The decree of the Michigan court determined the legal custody of Marjie Lee as between appellant and her former husband upon facts existent at the time the divorce decree was rendered. Herein no question of full faith and credit to the final judgment of a sister state is involved. The mother, appellant, to whom the legal custody was awarded by the Michigan decree consented to the adoption and to the transfer of the custody for adoption, and was a party to the arrangement whereby Marjie Lee was physically present in Missouri subject to the jurisdiction of a Missouri court.
Appellant further contends that the transfer of custody order and the decree of adoption in this case were erroneously entered because there was no investigation, and no written report as required by § 453.070, RSMo 1949, V.A.M.S.; and that the original transfer of custody awarded the child to respondents "under the supervision of Child Welfare Services," and consequently respondents "have never had nine months' sole and actual legal custody" of Marjie Lee. But the phrase awarding the custody under the "supervision" of the stated agency was, no doubt, the trial court's manner of continuing in supervisory fashion the investigatory program required by statute which, it is readily inferred, was instituted at the direction of the court prior to the original transfer of custody order. The transcript of the evidence is replete with references to interviews and inquiries by the Services in St. Louis County, and in Detroit, at the instance of the Services, and we have the evidence of the examination of Marjie Lee by the psychologist and of operations performed at the request of the agency. This evidence signifies to us that the salutary investigation requirement was conscientiously fulfilled, as most assuredly it should have been.
As to the required reportthe court, prior to the hearing, had denied the parties' motions to inspect the court files pertaining to the case, but at the beginning of the hearing the trial judge invited the parties' counsel to examine the file and then directed a showing in the record that he was showing counsel the report "which was received * * * which was filed with the Court in regard to this case." Although the report was not admitted into evidence, it is contained in the transcript. It is in form of a letter dated November 8, 1954, and written by J. P. Lynes, County Director, and Adeline M. Lodge, Child Welfare Worker, St. Louis County Welfare Office, Child Welfare Services. It is addressed to "Mr. Ralph Smith, Chief Juvenile Probation Officer, St. Louis County Juvenile Court." Other contentions relating to the refusal of the Court to permit counsel for the parties to examine the court file (containing the report) prior to the hearing, and to the hearing of evidence supporting the petition for revocation and the petition for adoption at the same time, are ruled adversely. The procedure of hearing the evidence supporting the two petitions was without objection, and the report, as stated, was made available to the parties at the time of the hearing. No prejudice to appellant in the procedural manner of the determination of her parental rights is apparent. As stated, the court appointed a guardian ad litem after the petition for adoption was filed and prior to the hearing. § 453.020, supra. Appellant's contention that the adoption decree must fail, because the guardian ad litem did not perform his duty "to dissent, defend, recommend or to investigate" is without merit. The record shows that the hearing developed into an adversary contest between appellant and respondents, and that the guardian ad litem was present actively cross-examining the witnesses in eliciting facts bearing upon the welfare of his ward.
We now turn to appellant's contentions that her consent to the adoption *572 was executed in circumstances of such dire necessity that the execution of the instrument was not her voluntary act and so should have been revoked; and that, even though the instrument be considered voluntary, the court nevertheless erred or abused its discretion in denying the revocation of her consent, and in rendering the decree of adoption.
It is true that in early 1953 Shirley Jean was confronted by circumstances necessitating a grave decision. She was working to support her child and herself, and to in part support her second husband, most of whose earnings were and had been since 1946 withheld by his mother. She had become pregnant and supposed that she could not continue her employment. The services of other women to whom the temporary care of Marjie Lee had been entrusted were no longer available, and so Shirley Jean turned to others, and finally to respondent Elsie at the suggestion of her former husband and his mother. (Appellant's allegation and assertion that she was prompted by duress in the form of threats is not sustained by the weight of the evidence.) Our careful survey of the evidence convinces us that Shirley Jean made her decision knowingly, and was prompted by the belief she was acting to the interests of Marjie Lee when she executed the consent to the adoption. Of course, her decision, as we have said, was not absolutely irrevocable, and future conditions obtaining might have intervened so as to make it to the best interests of the child that the consent be withdrawn, the adoption be denied, and Marjie Lee be returned to her mother.
One change of conditions which is urged by appellant was the fact that her second husband's mother in 1953 "relented," and commenced to actually pay the husband wages, and now (at the time of the hearing) has made an apartment available, rent free, to him and his family. This change in conditions, however, in our opinion emphasizes an insecurity in the Joseph Ambrogio establishmentthe home to which Marjie Lee must go, as Joseph's stepchild, if the consent were revoked and the adoption denied. It is our considered opinion, based on the evidence introduced, that the stability and security of Joseph's home greatly depend on the will, even the caprice, of his mother whose idol he says he is, and who has been known to withhold, with Joseph's acquiescence, the substance of his earnings which, but for her decision, he could have used in providing a real home for his family, including at that time the child Marjie Lee.
The anxiety, no doubt due to some privation, the lack of a home, and the corporal punishment which she may have sustained, were quite apparently having a deleterious effect on Marjie Lee, physically and mentally; and it is not surprising that she at once responded to the kindly welcome the Hagemanns seem to have tendered when she came to their home in February, 1953.
(Much has been made of the evidentiary showing that respondent Elsie, upon being urged to return Marjie Lee to appellant, mentioned the one complication that the Hagemanns had received gifts which would have to be returned, and since some of them had been used they would have to be paid for. It is said that therein lies the difference in the motives of appellant Shirley Jean and respondent Elsie. It is urged Shirley Jean's only concern was and is for Marjie Lee, and Elsie was and is concerned for Marjie Lee too, but Elsie has another concernwho was to pay for the gifts which had been used? Now we do not wish to minimize appellant's natural love for her child, and in reviewing this case we recognize as a factor the beneficence of the love of a natural mother for her child. But we shall not allow whatever inference of "money-consciousness" one might indulge from respondent Elsie's exclamation destroy the persuasive factor of affection which is now manifest between the child and respondents. We think it *573 would be inimical to Marjie Lee's well-being to now sever the time-tested ties which already bind her to respondents in a relationship like that of a child to parents.)
The evidence shows that now and even at the time of the initiation of these proceedings, Marjie Lee's health has improved and that she is happy and content in the Hagemann home. Her progress and scholarship in her school work, the improvement of her health and her mental repose surely must be the result of studied and affectionate care and indicate to us that it would be best that she become the child of respondents who, the evidence shows, are people of stability, of excellent character, and desirous of continuing to fulfill the responsibilities of parenthood. Their affection for her, and hers to them, as stated, has become quite as between parents and child. In this decision, we know we primarily have considered the welfare of the child, and we believe that, in the shown circumstances of this case, we have not unreasonably disregarded appellant's parental rights.
We, therefore, hold that the Juvenile Division of the Circuit Court of St. Louis County, in denying the revocation of consent and in rendering the judgment and decree of adoption, was acting in its sound discretion, and that the order, judgment and decree should be affirmed.
It is so ordered.
COIL and HOLMAN, CC., concur.
PER CURIAM.
The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.
All of the Judges concur.