In the Matter of the Application of John Milton Graham and Bonita Graham for the Proposed Adoption of Mary Fay Shelton, Marilyn Kay Shelton and Ernest William Wall.—199 S. W. (2d) 68.

Kansas City Court of Appeals. November 18, 1946.

Robert F. Sevier for appellants.

1038

*Lawson & Hale* and *Martin E. Lawson* for respondents.

DEW, J.—This is an appeal from decrees of adoption rendered by the Juvenile Court of Clay County, Missouri. On the petitions of John Milton Graham and Bonita Garmond Graham, his wife, to adopt Marilyn Kay Shelton, Mary Fay Shelton and Ernest William Wall, all infant children, decrees were granted as prayed, over the written objections of J. W. Shelton and Dorothy Shelton, parents of the two first named children, and over the objection of Dorothy Shelton, mother of the last named child. Previous to the objections filed, the consent of the appellants in writing had been filed by respondents. 'The three proceedings were combined and tried as one case, although separate judgment entries were made in each. At the close of the evidence of the petitioners (respondents), the above named objecting parents (appellants) orally demurred to the evidence of the petitioners, which demurrer was overruled. Appellants introduced no evidence and have appealed from the judgments granting the adoptions and changing the names of said children.

As to each of the infant girls the court found that "the parents have abandoned the child, so far as care, nurture, and necessary protection are concerned, and by their consent heretofore given to the proposed adoption, and by turning said child and birth certificate over to petitioners". As to the infant boy there was a similar finding that the mother and step-father had so abandoned him, and that his father was unknown.

According to the evidence and the admissions in the pleadings, the appellants are the parents of Marilyn Kay Shelton and Mary Fay Shelton, who, at the time of trial, were each eight months old. Appellant Dorothy Shelton is also the mother of Ernest William Wall, three years of age, whose father, according to his mother's filed objections, is Ernest William Wall, Sr., engaged at the time of trial in the armed forces of the United States somewhere in Germany. The appellant J. W. Shelton is the stepfather of the said infant Ernest William Wall. The appellants and all of said children were living at the time in question in Excelsior Springs, Missouri.

On September 10, 1945, respondents filed in respect to each of said minor children, a like petition for adoption, setting forth that the parents were so unsettled in their relations "and otherwise" as to be unable to care for such child; that the employment of the petitioners by the Salvation Army would insure the child a good home and security during its minority; that the petitioners are paid $25 a week by the Salvation Army, have a permanent position, and are furnished free of charge with a home of five rooms and bath, with all water, light and heat bills paid. Each petitioner prays for a decree of adoption and a change of the last name of the child to Graham. Each petition was later amended to allege that if such child should be adopted, the salary of the petitioners would thereby

be increased $3 for each child adopted, and that each of the respondents had a life insurance policy of $2500, payable to the other.

Upon the filing of the above petitions the court appointed a guardian *ad litem* for each child, which guardian filed a report on the same date as to each petition, favorable to the petition and to the petitioners.

Previously, on July 3, 1945, appellant J. W. Shelton executed the following instrument on the stationery of the Salvation Army, prepared by respondent John Milton Graham:

"THE SALVATION ARMY

233 East Broadway      Phone 972      Excelsior Springs, Missouri

July 3, 1945

To whom it may concern:

I, Joseph Willis Shelton do this day 7/3/45, relinquish all rights and claims on my children Mary Fay Shelton and Marilyn Kay Shelton age 6 months, to Captain & Mrs. J. M. Graham.

Dec. 23, 1944

Joseph Willis Shelton
signature".

On the same instrument appellant Dorothy Shelton executed the following:

"To whom it may concern:

I Dorothy Shelton do this day 7/3/45, relinquish all rights and claims on my children Mary Fay & Marilyn Kay age 6 months, to Capt. & Mrs. J. M. Graham, Dec. 23, 1944

Dorothy Shelton
signature".

Both acknowledged the above instruments on the same day and delivered same to Captain Graham. Appellant Dorothy Shelton also signed, acknowledged and delivered the following instrument, prepared on the same kind of stationery:

"THE SALVATION ARMY

233 East Broadway      Phone 972      Excelsior Springs, Missouri

June 29th 1945

I Dorothy Shelton do this day 7/3/45 relinquish all rights and claims on my child Earnest William Wall, age 3 yrs. to Capt. &

First      Middle      Last

Mrs. J. M. Graham

Dorothy Shelton
signature".

There was also filed on September 10, 1945, in connection with each petition, a formal consent by appellants to the adoption prayed, each dated July 6, and signed by the appellants, making reference to Chapter 56, Article I, Revised Statutes Missouri, 1939, waiving service of summons and agreeing to an order of adoption forthwith, without further notice. These instruments were witnessed by two witnesses.

Before the beginning of the trial, which was held four days after the petitions were filed, appellants, appearing at the hearing in person and by attorney, filed objections to said adoptions, asking return of the children to them, alleging that they had never deserted the children for more than two years prior to this proceeding, that neither was under a prison sentence, and that neither had neglected to provide proper care and maintenance for said children for two years preceding said date; alleging further that Dorothy Shelton desired to withdraw her consent to the adoption of said Earnest William Wall for the same reasons, adding that said child's father was Earnest William Wall, Sr., then engaged in the armed forces of the United States, and somewhere in Germany. They alleged further that they loved their said children, desired the opportunity to raise them as their own, and asked dismissal of the petitions.

Motions to dismiss the petitions were filed by appellants on the ground that it appears on their face that they did not comply with the statutes governing them. Both the objections and motions were overruled and all the petitions were tried in one hearing.

In the motion to set aside the judgments, for dismissal of the petitions, and in their motion for new trial, the points were made that the evidence failed to show that the parents had wilfully abandoned the children for a period of two years preceding the date the petitions were filed, and that the alleged consent of the parents having been withdrawn, such wilful abandonment of such children for such period was essential to the court's jurisdiction to enter a decree of adoption; that there was no evidence of neglect of such children as required by Section 9609, Revised Statutes Missouri, 1939. These motions were overruled.

Respondent John Milton Graham testified, in substance, that he was a minister and for eleven years had been employed by the Salvation Army, now with the grade of Captain. The two female children involved are twins and eight months old. The male child is three years of age. They had all been in the custody of the witness and his wife for the preceding two months; that when the boy was given to the respondents he was much underweight but had improved since. The witness first came in contact with the children one night in June, 1945, when someone asked him to go to their home. Upon arrival there he found neither the father nor the mother present, but a young girl about 14, who lived next door, was taking care of them, and was giving the little boy his bath. The lady in the back room had bought some milk for the children. The mother had not been there since noon and did not return until 10:00 o'clock that evening. On the following day witness and wife called and the young father had returned, having been away a week. Mrs. Graham remained and had a long conversation with the parents, urging them to go back together and make a home for the children. The father

remained at the home that evening but the next morning left the home.

This witness further stated that later he made a proposition to the parents that witness and wife adopt the children. He was present when the parents signed the first instruments relinquishing the children. The little boy was turned over to witness and wife on June 29, 1945, and the two younger children on July 3, 1945. Witness and wife had had custody since those dates. When the children were turned over to them, Mrs. Shelton also delivered to them their birth certificates. Before delivering the children to respondents the parents told him that they did not believe they could get along and knew that respondents could give the children more than the parents could, and for that reason they were willing for respondents to keep and adopt the children, and asked that that be done. They accused each other of keeping company with different parties. On one occasion Mrs. Shelton came to the witness on the street and told him she had obtained a job and would like witness to find a home for her children. He offered to take care of the boy that night, but did not suggest anyone for permanent custody. He heard nothing from the mother thereafter for a week. Later he got a note from her, suggesting giving the boy to the witness.

Witness further stated he received a salary of $25 a week and a home with lights, water, gas, and auto expense furnished. He said an additional allowance of $3 apiece would be made for any children until they are 16 years of age. He believed that he could support his wife and the children on his income. He stated that on one occasion after the children had been turned over to him that he had given J. W. Shelton $17 when Shelton stated that he and his wife had decided to go to Kansas City and wanted to pay room rent and buy food, as they wanted to go to California and start life over. He stated that when the children were delivered at his home he wrote out the relinquishment agreements on the Salvation Army stationery, which were signed. Later he had the agreements rewritten in order to cover a change of names. None of the conditions that he testified to had continued for a period of two years preceding the filing of the petitions. The witness further testified that he had no children of his own, had been married eleven years, and had lived a short time in Excelsior Springs, and outlined his various places of residence.

Mrs. Graham testified substantially as her husband as to such of the incidents when she was present. She said the little boy was run down, lacked energy, and seemed to be underfed. She testified that J. W. Shelton had been sentenced to jail on some charge and had served a term of about seventeen days, during which time Mrs. Shelton received no support from him.

By other witnesses of respondents, consisting of members of the Salvation Army, a physician, a Justice of the Peace, and others, evi-

dence was produced tending to prove that various places where appellants lived were unfavorably located and conditions crowded; that J. W. Shelton had served seventeen days in jail for vagrancy, had been paroled, and had improved in conduct since; that his reputation for reliability in the matter of jobs was not good; that Dorothy Shelton's reputation for morality and association with men was bad, and that she was seen in an automobile with an older man; that when appellants were not at home and no milk was on hand for the children, others would purchase it; that the children were not strong, but had difficulty in "getting started" as the type of milk suited to them was difficult to obtain; that J. W. Shelton had not been known to get drunk or be cruel to the children; that he had lately been seen to attend the Salvation Army church services, and had lived up to the terms of his parole from the jail sentence. He had been discharged from the army on account of a heart ailment. The reputation of respondents was good.

From time to time appellants objected to the entire testimony of the witnesses and moved to strike out the same on the ground that the same was not competent or material for the reason that there was no showing that there had been a wilful abandonment of the children for a period of two years prior to the filing of the adoption proceedings, nor such neglect for that period as the statute required in the absence of consent by the parents, and for the reason that there was no showing that the parents were insane or imprisoned, as provided by the statute. This objection was each time overruled and the point preserved by the appellants.

In substance, appellants' points are as follows:

1. Adoption can be decreed without the consent of the parents under Section 9609, Revised Statutes Missouri, 1939, only where certain specified conditions exist. These conditions were not present in this case.

2. "Abandonment" or neglect must be for the period of time set forth in said section.

3. A parent may withdraw his written consent to adoption at any time before judgment, even though the child has been transferred and even though the parent had abandoned the child, and adoption based upon a consent, later withdrawn, is void.

4. The adoption statute should be strictly construed in favor of the right of natural parents and every reasonable intendment should be made in their favor.

5. Courts do not decree adoptions merely because petitioners are able to furnish the children with finer clothes and homes than the parents.

Sections 9609, Revised Statutes Missouri, 1939, provides that the court shall not decree the adoption of a minor child without the consent in writing of the parents or surviving parent or guardian of

the child, if any, and then only when in the opinion of the court the welfare of the child demands such adoption. It further provides that such consent of the parents shall not be required if such parent is insane, or is imprisoned under a sentence which will not expire until two years after the date of the filing of the petition, or *"if he or she has wilfully abandoned such child or neglected to provide proper care and maintenance for the two years last preceding such date"*. (Italics ours).

Section 9614 sets forth the consequence of an adoption under the Adoption Code. Thereunder all legal relationship and all rights and duties between such adopted child and its natural parents cease and determine. The adoptive parents are thereafter entitled to the services, wages, control, custody and company of the adopted child, and inherit from such child, as if born to them in lawful wedlock, except property limited to the heirs of the body of such child.

These and the other sections of the Adoption Code (Chapter 56, Article I, Revised Statutes Missouri, 1939) must not be confused with the Juvenile Court provisions for delinquent or neglected children under Article 10 of the same chapter, applicable to counties under 50,-000 inhabitants, and a part of the series of statutes under Chapter 56, enacted in 1917 on the subject of children. Under Sections 9703 and 9704 of Article 10 of the above chapter, the Juvenile Court can provide for the care, discipline, supervision, protection and suitable custody and control of a neglected child during its condition of need. The purposes of such provisions are solely the welfare of the child, whereas the Adoption Code involves also the legal and civil rights of the parents and children and their natural status. The two proceedings are radically different in both purpose and effect. Relief of abandoned or neglected children is by no means limited to adoption, and can be afforded where needed without destroying the relationship of parent and child.

Adoption was unknown to the common law and was repugnant to the principles on which it was developed. [Clarkson v. Hatton, 143 Mo. 47, 44 S. W. 761.] From and after 1857 to 1917, there was statutory authority in this state for adoption by deed, executed by the adoptive parents, which did not require consent of the natural parents nor bind them, but only the right of inheritance of the adopted child was thereby established and no right of custody or other rights of the natural parents were affected. [Torwegge v. O'Reilly, 239 S. W. 116, 292 Mo. 613.] However, in 1899, institutions engaged in caring for abandoned and dependent children were given the power to furnish the necessary consent to adoption by a person by deed, with approval of the Probate Court, whereby all rights to exclusive custody were vested in the adoptive parent, provided, however, that "such child shall have been abandoned by such parent for a period of two years,"

or "thereafter shall have been abandoned by its parents for a period of two years." [Section 5250, Revised Statutes Missouri, 1899.]

In 1917, a Code of Adoption was enacted in this State of which Section 9609, Revised Statutes Missouri, 1939, is now a part. By this act adoption by deed was abolished and a proceeding by petition in the Juvenile Division of the Circuit Court was established, requiring the consent of the parents of the child except in cases therein specifically prescribed, as noted. The adoption statutes must be strictly construed in favor of the rights of natural parents in controversies involving the termination of the relationship of child and parent. [In re Watson's Adoption, 195 S. W. (2d) 331; In re Perkins, 234 Mo. App. 716, 117 S. W. (2d) 686; Thompson v. Arnold, 208 Mo. App. 102, 230 S. W. 322.]

It is the clear intent of the Adoption Code that the consent in writing of the parents or other guardian be had at the time of and as a requisite to a decree of adoption, unless one of the specified exceptions to that requirement exists. [Rochford v. Bailey, 322 Mo. 1155, 1161, 17 S. W. (2d) 941.]

It cannot be denied that appellants in this case did on July 6, 1945, give their consent in writing to the adoption of the children. They also signed relinquishments of the children a few days previously and delivered over the children and their birth certificates to the respondents. However, they formally withdrew their consent before trial and in writing protested and objected to the petition and prayed for the custody of their children. Under the greater weight of authority they had a right to withdraw their consent before the judgment, and, in effect, they did so. 2 C. J. S. p. 386, Section 21(4); State ex rel. Platzer v. Beardsley, et al., 183 N. W. (Minn.) 956; In re Nelms, 279 Pac. (Wash.) 748. In Volume 1, Am. Jur. Supp. 1945, subject Adoption, Section 37.1, it is stated:

"The rule in the great majority of the jurisdictions wherein the question has arisen is that a natural parent's consent to the proposed adoption of a child, duly given in compliance with a statute requiring such consent as a prerequisite to an adoption, may be effectively withdrawn or revoked by the natural parent before the adoption has been finally approved and decreed by the court."

Thus, we must conclude, the present proceeding was had and decrees granted without the consent of the parents.

The question yet remains whether the consent was required. Respondents contend that consent was not required because it was proven that the parents had wilfully abandoned the children, in the sense of the statute. Such abandonment, they argue, can be accomplished in "five minutes." Appellants contend that if the evidence is sufficient to show any abandonment, such abandonment must have continued for a period of two years next preceding the date the petitions were filed. Respondents do not rely on neglect of proper care as an excep-

tion to the consent requirement, and admit that such neglect must have continued for the two year period. In fact, two of the children were but eight months of age and could not have been neglected for two years. But respondents rely on wilful abandonmnet and contend that the two year provision does not qualify or apply to such abandonment. Appellants argue that abandonment is a continuing process, which may be terminated by the parents; that they effectually terminated the abandonment, if any, by their plea and protest before trial; that in any event it is the plain intent of the Legislature not to forfeit the rights of parents because of abandonment unless such abandonment shall have continued for the two year period prescribed. Appellants further argue that the proper grammatical construction of the clause under consideration in Section 9609 makes the two year provision applicable to the abandonment. They point out that the clause "wilfully abandoned the child" and the clause "neglected to provide proper care and maintenance for the two years next preceding said date" are connected by the conjunction "or" without a comma preceding the word "or" or any other punctuation thereafter to prevent the two year provision from applying to the first clause.

Abandonment, in the sense here under consideration, has been defined as "conduct of the parents indicating a settled intention to leave the child permanently in the care of others." It is a continuing process, and may be terminated. "Abandonment continues until parental care and support are resumed and it does not follow that the purpose to forego all parental duties may not be repented of, and in a proper case all parental rights again acquired." [2 C. J. S. p. 388-9, Sec. 21(2).] See, also, In re Watson's Adoption, *supra*. Both the abandonment and the termination thereof are matters for judicial determination.

In our opinion appellants did wilfully abandon the children to the respondents for adoption, in the sense of the statute, when they delivered them to the respondents with the birth certificates and with the signed consent agreements described. But having withdrawn their consent before the trial, and protesting the adoption at the hearing and praying for the return of their children, it then became a matter for the court to determine if such abandonment was thus terminated before the adoption, unless the abandonment, in any event, must, under the statute, have continued for two years next preceding the adoption. Of course, under the evidence, the abandonment had not continued but about sixty days.

Whether or not the abandonment for sixty days had been terminated before adoption, does Section 9609 require the abandonment to have continued for the two year period in order to avoid the prerequisite of the parents' consent to adoption? Construing the clause of that section under consideration and hereinabove italicized, from a grammatical point of view, the word "or" preceding the word "neglect" is a

disjunctive conjunction connecting two coordinate clauses of equal grammatical value. The general rule is that when a conjunction connects two coordinate clauses or phrases, a comma should precede the conjunction if it is intended to prevent following qualifying phrases from modifying the clause which precedes the conjunction. [Jones Practical English Composition, 3d Ed. 1941, p. 66.] The part of the statute contains no punctuation next preceding the word "or," nor thereafter, which would prevent the time provision from applying equally to both "abandon" and "neglect."

The St. Louis Court of Appeals held In re Perkins, *supra,* that the adverb "wilfully," preceding the word "abandon," in the clause under consideration, also modifies the words "neglect to provide," etc., which follow the conjunction "or."

Courts are reluctant to determine matters of such deep concern as mutal rights to parents and children solely upon consideration of punctuation or grammatical construction if the intent of the law may be otherwise determined. In that connection it is noted that the first legislative provision in this state for adoption to include right of custody (Section 5250, Revised Statutes Missouri 1899) authorized an institution entrusted with the care of a child to furnish the necessary consent for such adoption, but only if and when such child "had been abandoned by such parents for a period of two years." The present Section 9610, which supersedes the statute of 1899, substitutes the consent of such institution for that of the parents, but only if and when the child "shall have been abandoned for a period of two years." The present Section 9609, with which we are here concerned, makes the consent unnecessary if such person is imprisoned under a sentence "which will not expire until two years after the date of the filing of the petition." It further, admittedly, requires the "neglect to provide," etc., to have continued for "the two years last preceding such date" in order to avoid the requirement of consent. It would appear, therefore, that it is the policy of our Legislature to require the existence and continuation for at least two years, any conduct or condition of a parent (unless insane) as would forfeit his right to give or to withhold his consent to the destruction of his parental status. If the act of wilful abandonment, once committed, is forever irrevocable, as respondents claim, and would work *instanter* a forfeiture of all rights of the parent forever thereafter, a mother, in the depths of present distress and desperation, deserting her child on a stranger's doorstep, could not, within the hour, actuated by remorse, repentenance or a resurgence of true maternal instinct, reclaim as against others, any rights to the child as the natural parent. Such would seem repugnant to the intent of the Legislature in view of its related legislature on the subject.

In speaking of the same words of the same section In re McAvoy's Adoption, 173 S. W. 108, 112, we said:

1048

"Under this provision of the statute adoption may be decreed either when the natural parents consent thereto, or when the child has been abandoned by the natural parents and such abandonment has continued for a period of at least two years immediately preceding the institution of the adoption preceedings."

In view of the above, we construe Section 9609 to require the abandonment to have continued for two years next preceding the dates of the filing of the petitions for adoption in order that it may constitute an exception to the requirement of the parents' consent, and we find that such duration was not shown by the evidence in this case. Hence the consent of the parents was required. This consent was lacking and, therefore, no decree of adoption was authorized.

If such construction of the statute were debatable, then in such case we would have to apply the rule that "it is uniformly held as a simple matter of natural justice that adoption statutes are to be strictly construed in favor of the rights of natural parents, and that when controversy arises between natural parents and those who seek to destroy their parental status, every reasonable intendment is to be made in favor of the former's claim. [1 Am. Jur., Adoption of Children, Section 9; 2 C. J. S., Adoption of Children, Section 6".] [In re Perkins, 117 S. W. (2d) 686, 691.]

These conclusions render it unnecessary to discuss the other points made by appellants. The judgments are reversed. All concur.