**Rennie HEMPHILL, by and through her guardian, Charles F. Burns, Appellant,**

**v.**

**Rosa Mae Hemphill QUIGG et al., Respondents.**

**No. 48674.**

Supreme Court of Missouri,

Division No. 1.

Feb. 12, 1962.

Motion for Rehearing or to Transfer to Court en Banc Denied March 12, 1962.

Burns v. Hemphill, Mo., 316 S.W.2d 582, the trial court's dismissal of plaintiff's petition on the ground, inter alia, that it failed to state a claim upon which relief could have been granted was reversed and the case remanded for further proceedings. As disclosed by the former opinion the action was and is one by an insane woman residing in Oklahoma, through her duly qualified and acting guardian, whereby she seeks in count 1 to have a 1942 Missouri divorce decree, obtained by her then husband Roy Hemphill, declared void and, in count 2, an accounting of personal assets in the estate of Roy Hemphill, deceased, and a declaration of the interests of plaintiff and defendants, including Rosa Mae Hemphill Quigg, who, ostensibly at least, married Roy Hemphill in 1946, in certain real estate. We held on the former appeal that, as a matter of law, only one paragraph of the allegations asserting reasons for the invalidity of the divorce decree could constitute a sufficient basis for declaring the judgment void, for the reason that all other allegations were of matters pertaining to the merits of the cause upon which the judgment of the court was rendered and did not allege fraud in the procurement of the judgment which was extrinsic or collateral to the matters which were or could have been adjudicated in the divorce proceedings. The paragraph of the petition which stated a claim for relief, as summarized by the court was (316 S.W.2d 587): that the guardian ad litem appointed to represent present plaintiff, the defendant in the divorce suit, "failed to communicate with his ward or any of her relatives or friends or to notify any of such persons as to when the cause was to be heard; that he failed to make any investigation whatsoever concerning the facts and circumstances involved; and did not act in the interest of his insane ward but solely in accommodation of Roy Hemphill and his counsel." Upon remand the case was tried on the foregoing averments.

Rex Titus, Joplin, for appellant.

Clarence Craig, James E. Brown, Emerson Foulke, Joplin, for respondents.

COIL, Commissioner.

This is the second appeal in this case. On the first, Hemphill by and through

Rennie Hemphill, present plaintiff, married Roy Hemphill in 1916. Most or all

of their married life was spent in Commerce, Oklahoma. There were four children born of the marriage, the oldest, Joe, deceased at the time of the present trial, and the youngest, Jack, who was born in July 1925. On January 8, 1926, Rennie, then 26 years of age, was admitted to an Oklahoma state hospital for the insane, her illness being diagnosed as schizophrenia, catatonic type. Apparently, since her admission, continuously, and at trial time, there was no prospect for her recovery.

On March 4, 1942, Roy filed a suit to divorce Rennie in the Circuit Court of Jasper County, Missouri. The petition alleged, inter alia, that he and defendant had lived together as husband and wife since their marriage in 1916 "until the —— day of January, 1922" and that defendant had offered him such indignities as to render his condition intolerable. The circuit judge's docket disclosed that on April 13, 1942, a guardian ad litem was appointed for defendant and, on April 14, his answer was filed which admitted the marriage and that plaintiff and defendant had lived together as husband and wife until the —— day of January 1922, and denied every other allegation and demanded strict proof thereof. On April 16, 1942, the trial court granted plaintiff a divorce as prayed and allowed the guardian ad litem a fee of $15. (Roy Hemphill had theretofore in December of 1941 filed an identical petition for divorce in the same court and, on January 8, a guardian ad litem, a different person than the guardian in the subsequent suit, was appointed. On January 10, 1942, a decree of divorce was granted but shortly thereafter was set aside by the court on its own motion as void "Due to short Service.")

On August 1, 1946, more than 4½ years after his divorce from Rennie, Roy married present defendant Rosa Mae Hemphill Quigg. Roy died on December 12, 1955, and this action was filed on February 10, 1956.

At the present time the guardian ad litem, an attorney 72 at trial time, was called as a witness by plaintiff and testified that the circuit judge who appointed him guardian, had talked with him a few weeks before he (the witness) consented to act and that he had made his investigation, as we infer, by the time of his formal appointment; that the judge advised him that there had been a previous Hemphill divorce case but did not tell him any details concerning it; that he talked with the attorney who had been the guardian ad litem in the prior case in which the decree had been set aside; that he had known the Hemphill family quite well and had theretofore seen Rennie Hemphill but had not been personally acquainted with her; that prior to filing his answer, he talked with certain people in Joplin concerning the then condition of Rennie Hemphill; that, among others, he talked with Joe Hemphill, then a grown man, the oldest son of Roy and Rennie Hemphill; that Joe told him that his mother had no property and that she had gone "plumb berserk" after the baby was born and couldn't thereafter pull herself together; that Joe also had told him that he, the witness, could not see his mother if he went to the hospital and there was no use to go and that he (the witness) had tried to see a patient in the same hospital in connection with another case and had been refused permission. The guardian testified further that he was present at the trial, asked some questions on cross-examination, as did the trial judge, and that it was shown at the trial that the indignities alleged occurred prior to the birth of Rennie's son Jack. He further testified that he had correctly stated in a deposition that he had not inquired as to the exact date when Rennie's insanity started; that he did not investigate to find out when they had stopped living together or what their relations were while they lived together; that he could not recall at the present trial what the testimony was with respect to whether Roy Hemphill testified at the divorce trial that he and Rennie were separated when she was pregnant with Jack; that he did not go to Commerce, Oklahoma, to ques-

tion persons who resided in the same community as Roy and Rennie when they lived together, and that he did not go to the Oklahoma hospital or talk with anyone connected with the hospital about the case.

It was conceded that the answer filed by the guardian ad litem and the petition filed by Roy Hemphill's attorneys were prepared by the same typist on the same typewriter and on paper from the same box. The typist, Roy's attorney, and the guardian all testified that the offices of the attorneys who prepared the petition and of the guardian were on the same floor of the same building; that neither of Roy's attorneys had a stenographer; that the guardian did have a stenographer who often did work for plaintiff's attorneys on her regular employer's typewriter. The stenographer testified that the divorce petition was dictated by one of Roy's attorneys and she typed it on her typewriter. The guardian testified that he dictated the answer on the date shown.

One of the two attorneys for Roy Hemphill (the other was deceased at the time of the present trial) testified that Roy was the only witness at the trial of the divorce case; that Roy had testified that he and Rennie separated and ceased living together as husband and wife shortly after she became pregnant with Jack; that the trial judge examined Roy when he was on the witness stand at the divorce trial as to when Rennie first became ill; that Roy had said that "they" noticed that Rennie became ill some little time before Jack was born.

There was other evidence by relatives and neighbors of Roy and Rennie that her mind began to get bad at the time Jack was born; that they noticed something was wrong when Jack was three months old.

Without detailing the testimony of each of the other witnesses, suffice for present purposes to say there was substantial evidence adduced by plaintiff to the effect that Roy and Rennie lived together as man and wife until Roy took Rennie to the hospital on January 8, 1926, and that they lived together as man and wife thereafter for a period of five or six weeks in January and February of 1927 when Rennie was temporarily released from the hospital. The evidence to that effect consisted of the oral testimony of the Hemphills' relatives and neighbors and there was a transcript of the testimony of certain witnesses, including Roy Hemphill, at a 1939 "dower" hearing in the Circuit Court of Jasper County at which duly appointed commissioners were determining whether to recommend to the court that Roy Hemphill be permitted to give a lot to his son Joe for the purpose of building a home thereon, wherein Roy said that he and Rennie lived together as husband and wife "at the time she went to the hospital." That transcript was on file in the Jasper County Circuit Clerk's records.

Plaintiff also adduced the testimony of Doctor Hayes, a psychiatrist at the Oklahoma hospital, who was there at the time of Rennie's admission and had been there continuously since. He testified that Rennie would not have been able to have consulted with an attorney or guardian or to have assisted such a person in the defense of a divorce action at any time since she had been admitted to the hospital; that the following from the allegations of indignities contained in Roy's petition for divorce would be a good description of Rennie's condition when she was admitted: "high tempered, peevish, fault finding, continually quarrelsome and would fly into fits of anger without provocation, and would use loud and abusive language, and would work herself up into a mental state where she would loose all control of herself, and wouldn't listen to reason, or explanation, that she had imaginary grievances, and she could never agree with her husband on anything, she would become nervous, and go into tirrades and she claimed and imagined that her husband thought more of other people than [he] did of her." The doctor testified further that the condition in which he found Rennie on January 8 did not begin as of that date and it was the doctor's present opinion that it would have been his opin-

ion in April 1942, if someone had inquired, that Rennie was of unsound mind at the time she did the things alleged in the petition as indignities, although he also said he could not have made an accurate estimate as to her sanity or insanity three years prior to her admission to the hospital without an examination of her, but, nevertheless, if the allegations in the petition were true, in his opinion she was mentally ill at the time those things occurred.

The hospital admissions record stated that the information thereon was furnished by Roy and Rennie's sister and one question and answer indicated that attacks of mental disease had occurred "2½ years ago."

The trial chancellor found that the guardian ad litem "did all that was reasonably required of him" and refused to declare the divorce judgment void and adjudged that Rennie had no right, title or interest in the personal property which Roy owned at the time of his death and had no right, title or interest in any of the real estate described in the petition.

■■ Our review of this action in equity is de novo. We weigh the evidence and arrive at our own conclusions as to its weight, taking into account the position of the trial chancellor to have judged the credibility of the witnesses. The burden was and is upon the plaintiff to prove by clear and convincing evidence the fraud relied upon in the procurement of the judgment.

Plaintiff contends the evidence discloses that the guardian ad litem failed and omitted to properly investigate the truth of the averments in the divorce petition and thereby failed to discover and to plead the facts of and to adduce substantial evidence in support of the defenses that the indignities complained of by Roy Hemphill in his divorce action occurred at a time when defendant was insane and that those indignities, if so, had been condoned by Roy.

In the opinion on the former appeal a guardian ad litem's duties generally and under the allegations of the petition in this case were stated thusly: "The guardian ad litem for an insane defendant should be more than a mere figurehead. The appointment of such a guardian is not a bare technicality and the office involves more than perfunctory or shadowy duties. In most instances a guardian ad litem may not discharge his duties by merely filing a formal answer requiring the plaintiff to prove the allegations of his petition. He is required to take all steps reasonably necessary to protect and promote the interests of his ward in the litigation. In a case such as the divorce proceeding in question the guardian ad litem (an attorney) should have made an investigation of the facts and the law applicable thereto, and he should have filed an answer setting up all defenses (including the affirmative defense that his ward was insane at the time of committing any acts that were alleged to be indignities) that could have been supported by substantial evidence. In the preparation and trial of the case he should have exhibited the same (if not greater) attention and vigilance in defense of the action as he would have employed on behalf of a sui juris defendant who has privately engaged him as counsel. For cases discussing the duties of a guardian ad litem, see Spotts v. Spotts, 331 Mo. 917, 55 S.W.2d 977, 87 A.L.R. 660; Kennard v. Wiggins, 349 Mo. 283, 160 S.W.2d 706; Cox v. Wrinkle, Mo. Sup., 267 S.W.2d 648; Niedergerke v. Niedergerke, supra [Mo.App., 271 S.W.2d 204]." Hemphill by and through Burns v. Hemphill, supra, Mo., 316 S.W.2d 587. (Bracketed insert present writer's.)

■ Our review of the evidence convinces us that if the guardian ad litem in this case had performed all the acts in the manner and to the extent that plaintiff insists he must have, he should and would have discovered facts and circumstances which would have constituted substantial evidence to support the defenses of condonation and that his ward was insane at

the time of committing the alleged indignities. It is true that whether either of those defenses could have been successfully maintained is speculative because, for example, the discoverable evidence pointed to by plaintiff does not necessarily establish that at the time of the indignities alleged plaintiff was insane or that her insanity was such as would constitute a defense, i. e., such that it deprived her conduct of the element of willfulness and divested her of the use of her reason to the extent of her being unable to differentiate between right and wrong or that she was acting under an irresistible impulse generated by a diseased mind. Willis v. Willis, Mo.App., 274 S.W. 2d 621, 627 [9–14]. Furthermore, as we have pointed out, there was evidence that Rennie's mental trouble was first noticed after or about the time her last child was born, which, under the evidence, was not more than five months prior to the time she was admitted to the hospital. But it was not incumbent upon the plaintiff to show conclusively that either or both the noted defenses would have defeated the divorce action. It was sufficient on that aspect of the case that plaintiff showed that by reason of the indicated evidence there could have been tendered at the trial a seriously litigable issue as a meritorious defense to the divorce action. See Hockenberry v. Cooper County State Bank, 338 Mo. 31, 88 S.W.2d 1031, 1037 [7, 8]; Beil v. Gaertner, 355 Mo. 617, 197 S.W.2d 611, 616 [4].

It does not follow, however, that simply because it was made to appear in this case, after the lapse of some 18 years since the divorce judgment, that if the guardian ad litem had done certain acts in a certain way he would have discovered certain evidence and that it would then have been his duty to have asserted the mentioned defenses and to have adduced evidence in support thereof, the guardian ad litem's failure to have acted in the manner suggested by plaintiff constituted actual or constructive fraud in the procurement of the divorce judgment.

It is clear to us, and we so hold, that there is no evidence in this record which tends to establish any willful wrongdoing, i. e., any actually fraudulent conduct, on the part of the guardian ad litem. There is no evidence, direct or circumstantial, which justifies a conclusion that the guardian ad litem colluded with or conspired with the plaintiff in the divorce action or with his counsel in order to assist plaintiff in wrongfully obtaining a decree of divorce, or that he acted solely in accommodation of Roy Hemphill and his counsel; or that he failed to make any investigation of the facts; or that he failed to speak with any of Rennie's friends or relatives. And, we note, there was a failure to prove the averments of the petition, summarized in the former opinion and set forth herein, supra.

In the view we take, it would be an unrewarding task to determine whether the evidence is so clear and cogent as to convince us that the failure of the guardian ad litem to have discovered and to have adduced evidence in support of condonation and insanity was the result of a failure on his part to have performed his duty to the extent that his dereliction, if any, amounted to a constructive fraud through and by which the divorce judgment was obtained; viewing the facts as they should have appeared to a reasonably careful lawyer at the time the guardian ad litem agreed to accept his appointment as such and determining whether in the light of those facts the guardian acted as a reasonably careful lawyer would have acted under the same or similar circumstances. For, as we see it, even if the guardian failed to fully discharge his duty and even if we found that such failure amounted to a constructive fraud by reason of which the divorce judgment was obtained, the application of equitable principles to certain of the facts here present imperatively calls for our refusal to adjudge the divorce decree void.

An equity court has the power to vacate a decree of divorce for extrinsic

fraud in the procurement of the judgment notwithstanding the prevailing party has remarried, Cherry v. Cherry, 225 Mo.App. 998, 35 S.W.2d 659, 661 [10]; 27A C.J.S. Divorce § 171a, p. 688; and notwithstanding one of the parties has died, Richmond v. Richmond, Mo.App., 225 S.W. 126; 27A C.J.S. Divorce § 171a, p. 689; Annotation, 157 AL.R. 6, 53. The divorce judgment in such cases is voidable. 27A C.J.S. Divorce § 169b(1), pp. 678, 679. Whether a court of equity should exercise its power to vacate a decree of divorce in such cases, however, depends upon general equitable considerations, Restatement, Judgments, § 127, rests in the sound discretion of the court and depends upon the facts in the particular case. Bussey v. Bussey, 95 N.H. 349, 64 A.2d 4, 12 A.L.R.2d 151. See Annotation, 12 A.L.R.2d 151, et seq. Courts manifest reluctance to set aside divorce judgments where an innocent third person has married a divorced spouse. Cherry v. Cherry, supra, Adams v. Adams, 51 N.H. 388; Swift v. Swift, 239 Iowa 62, 29 N.W. 2d 535, 539. "After a long lapse of time and change in status of persons upon faith in the validity of the decree, 'this power will be exercised with great caution,'" Bussey v. Bussey, supra, 64 A.2d 5; Annotation, 157 A.L.R. 6, 51, 52, and only upon a strong showing, Matthews v. Matthews, 224 Mo. App. 1075, 34 S.W.2d 518, 523 [4]. In a proceedings such as this the court is dealing not only with the rights of individuals but also with the public interest, Willis v. Willis, supra, 274 S.W.2d 626 [7, 8] and in some "situations it may be in the public interest to recognize an invalid divorce and preserve a remarriage rather than to resort to a dubious attempt to resurrect the original marriage." Swift v. Swift, supra, 29 N.W.2d 539.

■ Upon the record before us, the second wife acted in good faith. There was no hasty marriage following the divorce. Four and a half years passed between Hemphill's divorce and remarriage. No facts indicate that the second wife had mercenary motives, or was guilty of any inequitable conduct, or had any reason to suspect that the divorce proceedings, regular on the face of the record, were voidable. No effort was made to void the judgment during the lifetime of Roy Hemphill. As long as he lived and continued to accumulate property, and as long as he was available to negative the evidence which indicated that he had condoned Rennie's acts of indignity and the evidence that these acts occurred before the onset of her insanity, no effort was made to upset the divorce decree. It was only after he died and ceased to be productive, and was no longer available, that an action on behalf of the insane ex-wife to set aside the 14-year-old divorce judgment, was deemed advisable and expedient by those having an interest.

All six of the parcels of real estate described in count 2 of the petition were accumulated after Rennie entered the hospital; five of them were acquired after the judgment of divorce and four of the parcels were acquired after Roy's remarriage as estates by the entirety with his wife Rosa Mae. Rennie apparently made no contribution toward the accumulation of the described real estate. Rennie, a hopelessly and permanently insane person who has been in a mental institution for more than 35 years, has no interest in the recovery of any part of that property which a court of equity will consider superior to the interest of the second wife. To set aside the divorce judgment and to judicially declare that the second wife and Hemphill lived in a state of adultery from the date of their marriage ceremony to the date of his death, with all of the attendant ramifications of such a pronouncement, would accomplish no desirable result and would be inequitable and grossly unjust. Shammas v. Shammas, 9 N.J. 321, 88 A.2d 204, 210, 211.

Nothing we have said dealing with the specific question here presented should be construed as changing or lessening in the slightest degree the duty of a guardian ad litem as delineated in the former case of

Hemphill v. Hemphill, supra, 316 S.W.2d 587, and in the cases there cited. By reference we reiterate what has been said in those cases with respect to a guardian ad litem's duty. If a guardian ad litem is to err, it should be on the side of investigating too much rather than too little. Further, we make it clear that our refusal as a court of equity to set aside this judgment even if procured by constructive fraud, is based upon the unusual and particular facts of this case.

Plaintiff's right to the relief she sought in the nature of an accounting and to fix her interests in described real estate was dependent in the first instance upon the voiding of the divorce judgment. Inasmuch as we have refused to hold the divorce judgment void and although the trial chancellor adjudged other matters in the case affecting the interests of named defendants, inasmuch as no defendant has appealed from the judgment, our order should be and is that the judgment is affirmed on both counts 1 and 2, although, as our opinion discloses, we have reviewed the judgment only insofar as it refused to declare the divorce judgment void and denied plaintiff further relief.

Judgment affirmed.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.