In re ADOPTION OF P. J. K.

J. D. L. and N. J. L., Petitioners-Respondents,

B. J. K., Father-Appellant.

No. 8065.

Springfield Court of Appeals.

Missouri.

Aug. 7, 1962.

Motions for Rehearing or to Transfer

Overruled Aug. 22, 1962.

Douglas & Douglas, Neosho, for father-appellant.

Ruyle & Henry, Neosho, for petitioners-respondents.

STONE, Judge.

This is an appeal by an objecting father from a decree of adoption of his child by her stepfather. The child sought to be adopted is "a dainty, finely formed little girl with sparkling brown eyes, blond hair and fair complexion," who was born in L——— County, Texas, on February 4, 1958, of the marriage between B. J. K. (hereinafter called the father) and N. J. K. (hereinafter called the mother), which had been solemnized in Missouri on July 21, 1956, two weeks before the mother had attained her eighteenth birthday. This marriage, of which the child was the only issue, ran aground in stormy matrimonial seas and was dissolved on September 24, 1959, in the District Court of L——— County, Texas, by decree granting a divorce to the mother "on the grounds of cruel treatment" and awarding care and custody of the child to the mother but with no provision for the child's support. After the divorce, the mother and the child lived with the mother's parents in Southern Missouri until the latter part of 1959, when they settled in Springfield and the mother found employment to support herself and the child. In March 1960 the mother met J. D. L. (hereinafter called the stepfather) and, after a three-month courtship, they were married on June 18, 1960. Both were then twenty-one years of age. It was the first marriage for the stepfather, a high school graduate steadily employed for four years (at the time of marriage) as a body and fender man at an automotive repair shop.

On March 22, 1961, the stepfather instituted this adoption proceeding by the filing of his petition in which the mother joined for the stated purpose of giving her express consent to the adoption prayed Cf. In re Adoption of Siler, 240 Mo.App. 1097, 1098, 225 S.W.2d 379. As obviating the necessity of submitting the father's written consent to adoption, it was alleged that, for a period of more than one year immediately prior to the filing of the petition, he had willfully neglected to provide the child with proper care and maintenance. Section 453.040(4). (All statutory references are to RSMo 1959, V.A.M.S.) Immediately upon institution of the proceeding, the court appointed a member of the bar as guardian ad litem of the child [Section 453.020], and in due time the guardian filed his answer. On April 3, 1961, a juvenile court officer filed a detailed report or study [Section 453.070], which was, as the trial judge aptly summarized it, "very favor-

able" to the petitioning stepfather and mother. On May 18, 1961, the father filed his answer in which he objected to the adoption of the child, stated that petitioners had not had the child "in their *legal* custody" for a period of nine months [Section 453.-080], alleged that the mother had "refused support from this defendant (the father) for the minor child and will not accept such support," complained that he had been refused the right to visit or see the child, denied that he had "willfully neglected to provide for her care and maintenance," and averred boldly and unequivocally that *"he* (the father) *has always contributed to the support of the child."* (All emphasis herein is ours.)

With all interested parties represented by counsel, a contested hearing was held on July 20, 1961, at the conclusion of which the matter was taken under advisement to permit the filing of briefs. And, on August 25, 1961, the trial court entered a decree of adoption supported by a written memorandum and finding of facts in which he emphasized (and appropriately so in view of the sharply-conflicting evidence) that he had had "the opportunity to see the parties face to face and hear the testimony and attempt to judge the sincerity of the parties" and expressed himself as believing "very strongly that the conduct of this father constitutes such willful failure to support and maintain that it comes within the statute [Section 453.040(4)] which eliminates the necessity for written consent."

■ Before treating of the merits, we first dispose of the "point" in the father's brief that the trial court was without jurisdiction because the child was a ward of the District Court of L——— County, Tex-

as, where the divorce was granted. The father's counsel toss in this "point" egregiously unsupported by authority and conspicuously undeveloped by argument. In language unmistakably clear, Rule 83.05(a) plainly requires that the points relied on shall be submitted "with citation of authorities thereunder" and that the brief shall include "an argument which shall substantially follow" the points. (All references to rules are to the Rules of Civil Procedure, V.A.M.R.) It is neither our function nor our duty to brief appellant's points [Morris v. Willis, Mo., 338 S.W.2d 777, 780; Ambrose v. M.F.A. Co-Operative Ass'n., Mo., 266 S.W.2d 647, 651; Beeler v. Board of Adjustment of City of Joplin, Mo.App., 298 S.W.2d 481, 483], and the "point" under discussion neither merits nor receives any consideration as such.[1] But concerned, as we always are, lest our courts inadvertently transgress their jurisdictional limits, we have put aside the unsupported "opinion" of the father's counsel on this question; and, upon independent investigation, we have determined that, since the mother, to whom custody of the child was granted by the Texas decree, consented to the adoption and since both she and the child were bona fide residents of Greene County, Missouri, when the adoption proceeding was instituted, the Juvenile Division of the Circuit Court of Greene County undoubtedly had jurisdiction of such proceeding.[2]

■ It may not be inappropriate to observe also at this point that the complaint of petitioners' (respondents') counsel concerning the statement of facts in the father's (appellant's) brief is fully justified. Rule 83.05(a) (2) requires "a fair and concise

1. Lansford v. Southwest Lime Co., Mo., 266 S.W.2d 564, 565(1); Metrick v. Bridgeways, Inc., 362 Mo. 476, 241 S.W. 2d 1015, 1019(7); Moore v. Rone, Mo. App., 355 S.W.2d 398, 405(9); Atkinson v. Coca-Cola Bottling Co., Mo.App., 275 S.W.2d 41, 46(5); Wattson v. James B. Welsh Realty & Loan Co., Mo.App., 266 S.W.2d 35, 37(2).

2. Section 453.010; In re Mayernik, Mo., 292 S.W.2d 562, 570–571(10); In re Alls' Adoption, Tex.Civ.App., 278 S.W. 2d 524, 526(3); In re Burton's Adoption, 147 Cal.App.2d 125, 305 P.2d 185, 191 (14–16); Modacsi v. Taylor, Fla.App., 104 So.2d 664(3); In re Chinn's Adoption, 238 Iowa 4, 25 N.W.2d 735, 737–738(4, 5); 2 Am.Jur.2d Adoption, § 48, loc. cit. 899.

statement of the facts without argument." "The statement is primarily to afford an immediate, accurate, complete and unbiased understanding of the facts of the case, and one which does not fairly present the facts is pernicious to the extent it conveys in the first instance a false, distorted, or imperfect impression of the facts." Wipfler v. Basler, Mo., 250 S.W.2d 982, 984(3); Markowitz v. University City, Mo.App., 335 S. W.2d 455, 456. "(A) statement which omits the essential facts on which an appellant's adversary relies cannot be deemed a substantial compliance" with Rule 83.05(a) (2). Walker v. Allebach, 354 Mo. 298, 189 S.W.2d 282, 283(3); Kleinhammer v. Kleinhammer, Mo.App., 225 S.W.2d 377, 378. Instant appellant's statement, which presents only facts favorable to the father and designed to support his contention, is within the category labeled as "pernicious" and does not approach even colorable compliance with the cited rule. But instant respondents have supplied an adequate statement [Rule 83.05(d)]; and, mindful that this proceeding involves the sacred relationship of parent and child, we have disregarded appellant's statement and have determined the appeal on its merits. Carver v. Missouri-Kansas-Texas R. Co., 362 Mo. 897, 245 S.W.2d 96, 100(3).

▉▉ We address ourselves to the only factual issue, i. e., whether the father's conduct, for more than one year prior to the decree of adoption, was such that it fairly may be said to have constituted willful neglect to provide proper care and maintenance for the child and thus to have obviated the necessity for the father's consent to adoption. Section 453.040. Although (as we have noted) the father's answer alleged that "he has always contributed to the support of the child," there was not a scintilla of evidence to that effect. On the contrary, it was established by abundant evidence that, during the period of two years from July 21, 1959 (when the father admittedly terminated his support of the mother and the child in Texas) to July 20, 1961 (the date of trial), his sole payment either to the child or for her support was the sum of $1.75 given to the child while he was visiting her sometime during 1960. Certainly the father did not provide proper care and maintenance for the child during that entire period of two years, but on this appeal his counsel contend that the finding of the trial court that the father had "willfully neglected" so to provide "was against the weight of the evidence." As counsel point out, our courts have declared repeatedly that, in controversies involving termination of the parent-child relationship, adoption statutes must be construed strictly in favor of parental rights;[3] and, in keeping with that policy of strict statutory construction, it is settled that the willful neglect contemplated by Section 453.040(4) is neglect that is intentional, deliberate, and without just cause or excuse. In re Perkins, 234 Mo.App. 716, 726–727, 117 S.W.2d 686, 692(6); In re Watson's Adoption, 238 Mo. App. 1104, 1114–1115(7), 195 S.W.2d 331, 337; In re Slaughter, Mo.App., 290 S.W.2d 408, 412. Thus, the determinative inquiry becomes whether the father's admitted failure to support his child was intentional, deliberate, and without just cause or excuse.

The father offered various explanations or excuses for his failure to support. Chief among them was the mother's alleged refusal to accept child support from him. The validity vel non of this excuse rested, in large part, upon the credibility of the parties and upon the weight and value accorded to their oral testimony. On the one hand, the father repeatedly fell back on this ex-

3. In re Mayernik, supra, 292 S.W.2d loc. cit. 568–569(3); In re G. K. D., Mo.App., 332 S.W.2d 62, 66(3); In re Slaughter, Mo.App., 290 S.W.2d 408, 411(3), 412; Adoption of McKinzie, Mo.App., 275 S.W. 2d 365, 369(5); Hyman v. Stanley, Mo. App., 257 S.W.2d 388, 390; In re Adams, Mo.App., 248 S.W.2d 63, 66(7); Application of Graham, 239 Mo.App. 1036, 1045, 1048, 199 S.W.2d 68, 73(1), 75 (12); In re Watson's Adoption, 238 Mo. App. 1104, 1113, 195 S.W.2d 331, 336 (1); In re Perkins, 234 Mo.App. 716, 726, 117 S.W.2d 686, 691(3).

cuse while, on the other hand, the mother categorically denied it—"I (the mother) have never refused any money that he has offered; *there has never been any offer to refuse."* The only documentary evidence tending to support the father's contention was the mother's statement that "I don't want support from B—— (the father) & won't accept it if he offers it," which appears on the thirteenth page of a twenty-one page handwritten letter from the mother to the father's sister dated December 28, 1959, in which the mother laid bare her soul and in a veritable torrent of words excoriated the father for his mistreatment of the mother and the child, reaffirmed the mother's fierce determination to protect and care for the child, and averred her ability to do so in the future as she had in the past during the period of several months from the separation of the father and the mother to the date of the letter. Upon trial, the mother quickly conceded that the quoted statement from her letter reflected "my feeling at that time—I was scared to death," but she insisted that had not been her feeling prior or subsequent to that time. True, the mother and the stepfather said that neither had demanded from the father any contribution for child support, but that fact as well as the mother's letter should be viewed against the backdrop of circumstances surrounding the Texas divorce.

The mother's testimony, accepted by the trial court, was that she had asked for child support when she had instituted her action for divorce, but that she had abandoned that request to avoid any contest about custody of the child. In her language, "when it came up in court that he (the father) would not fight for her (the child) . . . if we wouldn't ask for support, I laid it all aside and said, 'all right.'" The father's denial of any such conversation or discussion is not persuasive, particularly in view of the terms of a written agreement (hereinafter referred to as the agreement) executed by the father and by the mother under date of September 11, 1959, thirteen days prior to entry of decree in the divorce suit. After reciting the permanent separation of the parties and their "desire to make *a division of property and settlement* of *our property rights,"* the agreement (1) provided that the mother was to have "radio, electric iron, sewing machine, all of the dishes, all of the linens, vacuum cleaner, refrigerator given (the mother) by her mother, the Bible, electric clock, all of the cooking utensils . . . all her personal belongings and those of this child" and that "all other personal property" was "recognized and confirmed as the sole and unconditional property" of the father, (2) obligated the mother, immediately after the divorce, to convey to the father her interest in all jointly-owned real estate, (3) required the father, immediately after the divorce, to pay *"his* attorney and the court costs" and $1,000 to the mother, (4) *in a separate numbered paragraph* recited that "it is further agreed and understood that *the (father) will not be obligated in any way for the payment of child support or the fee of (the mother's) attorney,"* and (5) finally stated that, "at the option of either party," the agreement might be incorporated in the decree.

 The decree recited "that plaintiff (the mother) and defendant (the father) have accumulated, during their marriage, various items of household furnishings and appliances and a 2–½ acre home·place, an automobile, pick-up truck and livestock" and "that plaintiff and defendant herein have arrived at *a property settlement agreement* that is acceptable to both plaintiff and defendant and that the same was fairly arrived at and is an equitable division of property and should be approved by the court"; but, although custody of the child was awarded to the mother, the matter of child support was not mentioned in the decree. Under the law of Texas, the father's domicile, by which his obligation for child support is determinable [Berkley v. Berkley, Mo., 246 S.W.2d 804, 34 A.L.R.2d 1456; Yarborough v. Yarborough, 290 U.S. 202, 211, 54 S.Ct. 181, 185(8), 78 L.Ed. 269,

276(6); Restatement, Conflict of Laws, § 459, p. 548], *the decree* did not relieve the father of his primary and continuing duty to support the child.[4] And neither did *the agreement,* for, insofar as it purported so to do, it was clearly of no effect as offending against the principle that a contract by a father having for its object the evasion of, or relief from, his moral and legal responsibility to protect and care for his child is against public policy—a principle recognized in most jurisdictions[5] and followed both in Missouri [Jones v. Jones, 325 Mo. 1037, 1045, 30 S.W.2d 49, 53(1)] and in Texas. Snell v. Ham, Tex.Civ.App., 151 S.W. 1077, 1080(8). See also Thurman v. Fatherree, Tex.Civ.App., 325 S.W.2d 183, 186(8), error dismissed. A child born in wedlock is brought into this world with an inborn, innate right to support by its father, which he cannot shift, shed, shun or shirk by simply denying such obligation in a contract with another. Kershner v. Kershner, 202 Mo.App. 238, 242, 216 S.W. 547, 548; Messmer v. Messmer, Mo.App., 222 S.W.2d 521, 524; Kelly v. Kelly, 329 Mo. 992, 1005, 47 S.W.2d 762, 768, 81 A.L.R. 875.

With the father's counsel no doubt cognizant of this, the purported agreement was *not pleaded* in the answer, but both the father and his counsel made frequent reference to the agreement during trial. E. g., counsel asked the stepfather whether he had "read the property settlement and the agreement which these parties entered into in Texas," inquired whether the mother had agreed therein "not to accept support" from the father, and pressed for an answer to the question, "well, didn't she sign up to that down there, to your knowledge?" And, when the father's counsel took over the mother on cross-examination, he immediately produced and identified a signed copy of the agreement, read therefrom the above-quoted statement that "the (father) will not be obligated in any way for the payment of child support," and established by the mother that the agreement so stated and that she had signed it.

The father's reliance upon the agreement was no less open and significant. E. g., even after the father had been led skillfully on direct examination (a) to agree that he had made no contribution because the mother "never asked for anything" but that he "would have sent it if she had asked for anything" and (b) to profess that he was "willing, *in the future,* to support the child," the father again sought refuge in the agreement on cross-examination. Conceding that he had known that the mother "couldn't support herself and this child without anything" and "that somebody has been having to provide for the support for this child," he first said that "she (the mother) has refused the support" and then added "no, it wasn't in the court order, and it wasn't in our agreement." And, when the mother's counsel probed his shoddy, selfish refusal to permit the mother to take the baby bed when she returned to Missouri with the child, the father's excuse was that "the baby bed was owned by us before the baby ever came into the world"—"it wasn't listed" —"I was supposed to have all property and

4. Gully v. Gully, 111 Tex. 233, 231 S.W. 97, 15 A.L.R. 564; Lane v. Mangum, Tex.Civ.App., 203 S.W.2d 945, 946(2); Martinez v. State, 165 Tex.Cr.R. 596, 307 S.W.2d 259, 261(4). See also Vernon's Ann.Civ.St. art. 4639a, as amended Acts of 1961, p. 663; Dilger v. Dilger, Tex.Civ.App., 271 S.W.2d 169; annotation 69 A.L.R.2d 203, 210–211, and the Texas cases there collected. The law of Missouri is in accord: Kelly v. Kelly, 329 Mo. 992, 998, 47 S.W.2d 762, 764(2), 81 A.L.R. 875; Allen v. Allen, 364 Mo. 955, 958, 270 S.W.2d 33, 35(2); Lodahl v. Papenberg, Mo., 277 S.W.2d 548, 550 (1), 551(5); Broemmer v. Broemmer, Mo.App., 219 S.W.2d 300, 303(3).

5. 17 C.J.S. Contracts § 260 p. 643; 39 Am.Jur., Parent and Child, § 48, loc. cit. 674; Id., § 42, loc. cit. 653; annotation 42 L.R.A.(N.S.) 1014; annotation 27 L.R.A. 56; Zirk v. Nohr, 127 N.J.L. 217, 21 A.2d 766(1); Nelson v. Nelson, 340 Ill.App. 463, 92 N.E.2d 534, 536 (6); Pappas v. Pappas, 247 Iowa 638, 75 N.W.2d 264, 266, 57 A.L.R.2d 1134, 1137.

furniture which . . . wasn't listed on that court order for her." The "property and furniture" for the mother were "listed" *only* in the agreement, which in turn was mentioned in the decree.

At one point in his testimony, the father offered as an excuse for his failure to support the child after July 21, 1959 *(when the father admittedly terminated support)* that "I didn't even know where she (the mother) was—we tried to call up here and they wouldn't tell us where she was"; but he shortly conceded that "I figured she was at home" (where indeed she was) and that, after he knew of a certainty where she was, he still contributed nothing.

In his brief, the father lists four things he allegedly "did to show good faith," towit, (1) that he had carried hospitalization insurance on the child since her birth (this was his uncontradicted but unconfirmed statement to be taken with his concurrent admission that he did not know whether she had been in a hospital), (2) that he had "established a savings account for the child" in a Texas bank as indicated by an account book showing deposits in the aggregate amount of $83.65 ("she has to be there personally to draw the money"), (3) that he had "been to see the child five times" (and so he had, although there was much conflict in the evidence pertaining to those visits and, as the trial court observed, a question whether they were motivated "by paternal affection or desire to embarrass the mother and to cause her trouble"), and (4) that he "never forgot the child on Christmas." But, regardless of the labored explanations, lame excuses, and listed items of "good faith," the inescapable truth is that neither resourceful counsel nor the court has been able to wring out of the record any

evidence that the father contributed to the child's support or made any provision for her proper care and maintenance during the period of two years from July 21, 1959, to July 20, 1961. That the father was, at all times, financially able to support the child is not, and could not well be, denied. For the evidence clearly showed that he had been employed steadily by a major manufacturer since long prior to the child's birth, and that his "take-home pay" for a regular 40-hour week (and he often worked overtime) was $79 to $81 per week. We record parenthetically that the father, who is "considerably" older than the mother, also has remarried, his present wife having been "approximately nineteen" at the time of hearing.

The father's counsel relies primarily on In re Perkins, 234 Mo.App. 716, 117 S.W.2d 686. But the facts in the instant proceeding and in Perkins, supra, are poles apart, and that case is not persuasive or controlling here. As in other areas, no two adoption proceedings are presented in the same factual mold; and whether a father's neglect to provide for his child is willful, i. e., intentional, deliberate, and without just cause or excuse, must depend in each instance upon the peculiar facts and circumstances of the particular case at hand.[6] Bearing in mind our appellate duty to review the case upon both the law and the evidence as in suits of an equitable nature but with appropriate regard (a) for the opportunity of the trial court to judge of the credibility of the witnesses and (b) for the injunction that the judgment nisi may not be set aside unless it was clearly erroneous,[7] we are impelled to agree with the trial court's finding that the instant father's neglect to support was willful, and

6. For cases in which willful neglect was shown, see In re Wines' Adoption, 241 Mo.App. 628, 239 S.W.2d 101, 103; In re Snow's Adoption, 226 Mo.App. 340, 41 S.W.2d 627; Slaughter and Hyman, supra, note 3. For cases in which willful neglect was not shown, see Hartwig v. Hartwig, Mo.App., 333 S.W.2d

101; Thompson v. Arnold, 208 Mo.App. 102, 230 S.W. 322; Watson and Perkins, supra, note 3.

7. Rule 73.01; Section 510.310(4); In re G. K. D., supra, 332 S.W.2d loc. cit. 75(7); In re Slaughter, supra, 290 S.W. 2d loc. cit. 410(1); In re Snow's Adoption, supra, 41 S.W.2d loc. cit. 628.

thus that his consent to adoption was not required. Section 453.040.

However, the father also complains that, in any event, the trial court erred because (so it is alleged) there was no showing that petitioners (i. e., the stepfather and the mother) had had "the lawful and actual custody" of the child for at least nine months prior to entry of the decree of adoption on August 25, 1961. Section 453.080. The custody of the child had been awarded to the mother by the Texas decree on September 24, 1959, the child had been in the mother's custody continuously thereafter, and the mother (already a natural parent) did not seek to become an adoptive parent but simply joined in the petition in this proceeding for the purpose of consenting to the child's adoption by the stepfather, so there could be and is no issue pertaining to the mother's custody. Thus, the point under consideration is narrowed to the sufficiency of the stepfather's custody.

■ The undisputed evidence was that the stepfather married the mother on June 18, 1960, and that, during the ensuing period of more than fourteen months to entry of the decree of adoption on August 25, 1961, the mother and the child lived in the same home with the stepfather; but the father's position seems to be that the custody in which the stepfather shared during the aforesaid period was not "lawful and actual" as to him because there had been *no prior order of court* transferring custody of the child to the stepfather. However, in State ex rel. Dorsey v. Kelly, Mo. (banc), 327 S. W.2d 160, the Supreme Court pointed out that "section 453.080 does not require that an *order* of transfer of custody to petitioners for adoption be made as a prerequisite to lawful adoption" but only that " 'the court, *after due hearing, is satisfied* . . . that the person sought to be adopted, if a minor, *has been in the lawful and actual custody of the* . . . *petitioners* for a period of at least nine months' ", and again that "the custodial question presented to the court in decreeing adoption of a minor

under . . . section 453.080 is not whether there has been an order of a court of competent jurisdiction awarding custody of the child to petitioners during the minimum nine months' period, but rather is it whether custody of the child has been lawful and actual in the petitioners during that period." [327 S.W.2d loc. cit. 165] In Dorsey, supra, the court cited with approval In re Adoption of Siler, 240 Mo.App. 1097, 225 S.W.2d 379, in which it was held specifically that, where a petitioning stepfather had married the natural mother of a child and thereafter had shared custody of the child in the same home with the mother continuously for more than nine months, the stepfather's custody was "lawful and actual" during that period and the court had jurisdiction to entertain the stepfather's petition for adoption and to proceed to a decree, although there had been no prior order of court transferring custody to the stepfather. From the foregoing, we think it plain that there is no merit in the instant father's complaint.

■ Finally, the father assigns error for the alleged failure of the guardian ad litem to measure up, in the performance of his duties, to the high standard required of him. Hemphill v. Hemphill, Mo., 316 S.W.2d 582, 587; Hemphill v. Quigg, Mo., 355 S.W.2d 57, 61. Thirty-four days after his appointment, the guardian ad litem filed his answer in which, "upon his knowledge, information, belief and investigation of petitioners herein," he recommended the granting of the petition for adoption but prayed the court to require strict proof. There is no showing that the guardian ad litem did not conduct an investigation, as he reported that he had done; and, in the circumstances of this case where the court upon trial reached the same conclusion, the guardian ad litem is not discredited simply because he coupled with his request for strict proof a recommendation that the adoption be granted. This is not a case where "(i)t is obvious" that the guardian ad litem "did not fairly and adequately represent his ward" [Hemphill v. Hemphill,

supra, 316 S.W.2d loc. cit. 587]; and, in the absence of any showing to the contrary, we must presume attention, not inattention, to duty on the part of the guardian ad litem. Spotts v. Spotts, 331 Mo. 917, 932, 55 S.W.2d 977, 983(14), 87 A.L.R. 660; Meyers v. Smith, Mo.App., 349 S.W.2d 412, 414(3, 4). With the record demonstrating that the hearing was an adversary contest in which able counsel were diligent and zealous in eliciting and developing pertinent factual information bearing upon the child's welfare [cf. In re Mayernik, Mo., 292 S.W.2d 562, 571], we are not impressed by the father's after-trial complaint about the guardian ad litem. This assignment of error is denied.

 Even as in other actions involving the custody and support of minors, the welfare of the child is the primary and paramount consideration in an adoption proceeding, the wishes of the natural parents, of the petitioners, and of the child itself being secondary and subservient thereto. In re G. K. D., Mo.App., 332 S.W.2d 62, 67; Adoption of McKinzie, Mo.App., 275 S.W.2d 365, 372(8); In re Wines' Adoption, 241 Mo.App. 628, 239 S.W.2d 101, 104(2); In re Snow's Adoption, 226 Mo. App. 340, 41 S.W.2d 627, 628(2); Thompson v. Arnold, 208 Mo.App. 102, 230 S.W. 322, 324(4). On the whole record, we are convinced beyond doubt that the welfare of the innocent child, with whose future we are concerned, was served by the decree of adoption, and that, in reaching that result, the court did not deal with the father's rights improperly or unreasonably. Cf. In re Mayernik, supra, 292 S.W.2d loc. cit. 573. Accordingly, the decree is affirmed.

McDOWELL, J., concurs.

RUARK, P. J., not sitting.